In re ADOPTION OF A.S.V., a Minor (The People of the State of Illinois, Petitioner-Appellant and Separate Appellee, v. W.V., Respondent-Appellee and Separate Appellant (C.F. et al., Appellants and Separate Appellees)).

Fifth District   No. 5—93—0717

Opinion filed December 29, 1994.

Stephen E. Norris, of State's Attorneys Appellate Prosecutor's Office, of Mt. Vernon, for the People.

John R. Clemons, of Clemons & Hood, of Carbondale, for appellants C.F. and L.F.

Richard D. Murray, Jr., of Hunter & Murray, of Carbondale, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

A.S.V. was born on July 31, 1992. Her natural mother, M.Y., was never married to her natural father, W.V., the respondent herein. A.S.V.'s natural mother executed a final and irrevocable surrender of her parental rights to A.S.V. on August 4, 1992. On January 28, 1993, the State filed a petition for adjudication and termination of respondent's parental rights to A.S.V. On September 27, 1993, the trial court entered an order denying the petition for termination of respondent's parental rights. The State appeals from that order. Subsequently, the State filed a supplemental petition charging respondent with neglect as to A.S.V. The trial court evidently reconsidered its earlier decision and granted the supplemental petition. Respondent appeals from the order finding neglect.

The parties agree that the first issue before this court is whether the trial court's ruling of September 27, 1993, denying the State's petition for termination of respondent's parental rights, is against the manifest weight of the evidence. We find that the trial court's ruling is against the manifest weight of the evidence and reverse.

In order to aid the reader's understanding, we note that A.S.V. has never been in respondent's custody, due to the trial court's grant of the State's supplemental petition alleging that respondent had neglected A.S.V. Our ruling that the trial court erred in denying the original petition to terminate respondent's parental rights makes it unnecessary for us to consider in this consolidated appeal the issues raised by respondent as to the grant of the supplemental petition.

# I. FACTS

The State's petition to terminate respondent's parental rights, filed January 28, 1993, alleged that the natural mother had irrevocably surrendered her parental rights to A.S.V. on August 4, 1992, and that the natural mother had named respondent as A.S.V.'s natural father in an affidavit of parentage on the same date. The petition to terminate respondent's parental rights alleged that respondent failed to demonstrate a reasonable degree of interest, concern, or responsibility as to the welfare of A.S.V. during the first 30 days of her life or thereafter, that respondent was an unfit parent within the meaning of the Adoption Act (750 ILCS 50/1 *et seq.* (West 1992)), that A.S.V. was without a parent or legal guardian, and that respondent had "evidenced an intent to forego his parental rights." The State requested, *inter alia,* that the trial court declare respondent an unfit parent and terminate all of his residual parental rights to A.S.V.

On February 22, 1993, respondent's attorney filed an entry of appearance in the case. On February 23, 1993, respondent appeared in court and was advised of his rights. The case was continued for 60 days for the parties to conduct discovery. Respondent, who was present in court without his attorney, initially argued that a 30-day continuance would be more fair, in that "two months is a real long time and it gives the foster parents an unfair advantage in bonding with the child." The trial court explained that a certain amount of discovery was necessary to prepare the case for trial. Respondent then agreed to the 60-day continuance. At the conclusion of the proceedings, respondent asked if it was possible to have contact with A.S.V. on that date or anytime in the future. The court denied respondent's request. Respondent did not further object or request visitation during the pendency of the termination proceedings.

On May 4, 1993, the trial court conducted an evidentiary hearing on the State's motion to dismiss respondent from the case, which motion alleged that respondent "has denied paternity herein on numerous occasions." The State also requested that the court order blood testing of A.S.V., the natural mother, and respondent in order to determine A.S.V.'s parentage. Respondent saw A.S.V. for the first time in the courtroom at the May 4, 1993, hearing. Respondent testified that he believed A.S.V. to be his child because she looks like respondent and his son, W.V., Jr. Respondent admitted that he had not been convinced that he was A.S.V.'s father until he saw A.S.V. that day, and that he had expressed his doubts about his paternity to Department of Children and Family Services (DCFS) case workers from the time A.S.V. was born until that day.

Respondent admitted that M.Y. told him no later than August 4, 1992, that he was A.S.V.'s father, that M.Y. asked him for assistance

with the child, but that he refused because he did not believe the child to be his. Respondent admitted that he never took any action to obtain a blood test or to obtain any other information concerning A.S.V.'s paternity. Respondent testified that he did not know where A.S.V. was or how to go about obtaining a paternity blood test. "When I asked the DCFS workers about it, they kind of nonchalantly dismissed it." On cross-examination, respondent stated that he did not object to having a paternity blood test conducted. The parties stipulated that respondent and M.Y. had never married each other. The trial court ordered paternity blood testing.

On July 23, 1993, the court conducted an evidentiary hearing on the State's petition to terminate respondent's parental rights. The State withdrew its motion to dismiss respondent because the paternity blood testing indicated that there was a statistical probability that respondent is the father of A.S.V.

The evidence presented at the July 23, 1993, hearing is as follows. Respondent lives in Chicago. He was at least 24 years old at the time of the hearing. He is a high school graduate and has completed two years of college. He had been "fully employed" for at least five years before A.S.V.'s birth. At the time of the May 1993 hearing, respondent testified that he made about $650 to $700 per month. At the time of A.S.V.'s birth, respondent did not own a car, but his mother and brother each owned vehicles, although each of those vehicles was in poor condition.

Respondent and M.Y. met in 1987. Three children were born to respondent and M.Y. in three successive years before A.S.V.'s birth. W.V., Jr., the oldest, lives with respondent in Chicago, together with respondent's mother and his brother. The two other children, B.V. and A.V., live with M.Y. in Dallas, Texas. Respondent and M.Y. lived together in Chicago for about two years, but M.Y. moved to Dallas, Texas, before the birth of their third child in 1991. In late November 1991, respondent and M.Y.'s relationship was turbulent, but both M.Y. and respondent admitted that they had sexual intercourse at least once during that time period. Respondent testified that he did not know that M.Y. was pregnant with A.S.V. until May 1992, when he picked her up at the bus station in Chicago and saw that she was obviously pregnant. She told him not to worry about it because the baby was not his. He did not ask her any further questions about the baby's father. M.Y. had previously told respondent that she had a boyfriend in Texas with whom she was having sexual relations. Respondent admitted that before A.S.V. was born, M.Y. talked about placing the baby for adoption. He also stated that she had made similar statements concerning their second and third children, B.V. and A.V.

On July 31, 1992, M.Y. travelled by bus from Dallas to Chicago with B.V. and A.V. She was planning to return to Texas after a visit with W.V., Jr. At Effingham, Illinois, M.Y. unexpectedly went into labor and delivered A.S.V. M.Y. believed she was about 35 weeks' pregnant when she delivered A.S.V. Respondent called M.Y. at the hospital on July 31 or August 1, 1992, after receiving a message that M.Y. had delivered a baby in Effingham. M.Y. told him that she had given birth to a baby girl, who was doing fine. Respondent knew that B.V. and A.V. were at the hospital with M.Y. M.Y. asked respondent to come to Effingham to get her and the children, but he told her he could not. He testified that he tried to find transportation to Effingham but was unsuccessful. Respondent testified that he spoke with M.Y. on the telephone while she was in the hospital at least two more times. In one or two of these later conversations, M.Y. informed respondent that he was A.S.V.'s father and that she was going to put A.S.V. up for adoption. Respondent told M.Y. that he would not stand in the way of the adoption and that he would cooperate in any way necessary. Respondent did not believe he was A.S.V.'s father because M.Y. had told him earlier that he was not the father. Respondent did not bother to calculate the time period between his sexual relations with M.Y. and the birth of A.S.V., since he did not believe he was A.S.V.'s father.

While M.Y. and A.S.V. were in the hospital, respondent did not send any money or cards or gifts to M.Y., A.S.V., or the other two children. He did not ask M.Y. about the baby's condition or health after the initial phone call when he learned that the baby was "okay." He learned the baby's first name but did not inquire as to her full name. Respondent did not offer to pay any portion of the hospital bill for A.S.V. or M.Y. or the other two children, who stayed in the room with M.Y. during her five-day hospitalization. At the time of the July 23, 1993, hearing, respondent had not paid any portion of the hospital bill or any other medical bills or any support for A.S.V. whatsoever.

On August 4, 1992, Jean Habing, a case worker from Catholic Charities, and Kathy Williams, a DCFS case worker, took M.Y. to the Effingham County courthouse, where she appeared before a judge and signed the papers to voluntarily surrender A.S.V. for adoption. On August 4, 1992, after M.Y. surrendered her parental rights, Williams telephoned respondent. Williams explained who she was and that she worked for DCFS out of Mt. Vernon, Illinois. Williams asked respondent if he was A.S.V.'s father, and he responded that he really did not know but admitted that he had discussed A.S.V.'s adoption with M.Y. Respondent told Williams that he would do whatever was necessary to facilitate A.S.V.'s adoption. Respondent told

Williams he was not willing to take responsibility for A.S.V. He did not ask any questions about A.S.V., where she was, or who was taking care of her.

Williams explained that M.Y. had voluntarily surrendered her parental rights to A.S.V. and had signed an affidavit naming respondent as A.S.V.'s father. Williams explained the adoption process to respondent, and she told him that he could surrender his parental rights to A.S.V. She told respondent that she would make arrangements for him to sign the "surrenders" in Chicago so that he would not have to travel to southern Illinois. Williams gave respondent a telephone number in Chicago so that he could make arrangements to surrender his parental rights.

Respondent's testimony substantially corroborated Williams as to this conversation, with the exception that Williams testified that respondent gave her his work telephone number and asked that she not call him at home, because he did not want his mother to know about the adoption. Respondent testified that he gave Williams his work telephone number instead of his home number, but only because he wanted to handle the adoption himself. Respondent testified that he did not care if his mother found out about the adoption. Additionally, respondent testified that he did not know how to contact anyone at DCFS to inquire about A.S.V., but Williams testified that she gave respondent her work telephone number every time she talked to him.

Williams telephoned respondent again on August 7, 1992. She left a message for respondent with her telephone number and a request that he call her. Respondent did not return her call, so on August 10 or 11, 1992, Williams called respondent again. Williams explained to respondent that he was holding up the adoption and that DCFS could not and did not want to go forward with the adoption process "unless we knew what his position would be and he again reiterated that he would do anything and that he would sign surrenders."

Belinda Bayne, another DCFS case worker assigned to the case, called respondent on September 9, 1992, when A.S.V. was 40 days old. Respondent again stated that he wanted to surrender his parental rights to A.S.V. Bayne again explained to respondent that he could call one of the Chicago DCFS offices to schedule the time and place for signing the surrender papers. She also explained that if he did not sign the surrender papers, DCFS would "initiate a petition in court to terminate his parental rights." Respondent answered by telling Bayne that he did not want her to contact him at home because he did not want his mother to find out. Bayne agreed not to

call him at home but also explained that DCFS could not wait on him forever and that if the termination process was started, he would be contacted at his home. Respondent told Bayne again that he would contact the Chicago DCFS office to sign the surrender papers. Respondent testified that sometime in September 1992, he contacted the Chicago DCFS office to check on signing the surrender, but the papers were not ready for him to sign.

On or about December 7, 1992, DCFS mailed a certified letter to respondent at his home indicating that they had begun court proceedings to terminate his parental rights. Bayne testified that on December 14, 1992, she received a telephone call from respondent, who she considered "upset," "anxious," or "excited" about the letter from DCFS. Bayne testified that respondent was upset that his mother had found out about the letter and that he asked Bayne to help him think of something to tell his mother. Bayne refused to help respondent with this. Bayne asked respondent what he wanted to do about A.S.V. Respondent told her he still wanted to surrender his parental rights. Bayne again explained to respondent how to contact the Chicago DCFS office to surrender his parental rights.

On December 15, 1992, respondent telephoned Bayne. For the first time since A.S.V.'s birth, respondent stated that he changed his mind and that he did not want to sign the surrender papers even though he was still unsure if he was really A.S.V.'s father. On December 18, 1992, respondent again called Bayne. Bayne informed respondent that his mother had called her but that Bayne could not talk to his mother without a written release from respondent. Respondent emphatically told Bayne that he did not want his mother to talk to her. On the 18th of December, for the first time since A.S.V.'s birth, respondent stated that it did not matter if A.S.V. was his child or not, he wanted to see her. Respondent did not tell Bayne why he changed his mind. Respondent testified in court that the reason he changed his mind was that he wanted A.S.V. to be raised with her siblings, W.V., Jr., B.V., and A.V. He did not explain how this could be accomplished, since W.V., Jr., lived in Chicago with respondent and B.V. and A.V. lived in Texas with M.Y. There was no evidence to indicate that respondent and M.Y. had any plans to reunite.

The record is clear that from the date A.S.V. was born, July 31, 1992, until December 15, 1992, a period of 4$^1$/$_2$ months, respondent did not contact anyone at DCFS or Catholic Charities to assert his parental rights to A.S.V. Instead, respondent told all of the authorities dealing with the case that he wanted to surrender his parental rights to A.S.V. For the first 4$^1$/$_2$ months of A.S.V.'s life, he did not tell anyone he had changed his mind about the adoption, and

he did not inquire about paternity blood testing. More telling, he did not inquire about A.S.V. He did not ask to see her or even if he was allowed to see her. He did not ask any questions about where the foster parents lived or what kind of people they were. He never offered to provide any support for her, he sent her no gifts, and he never asked how to send her a gift.

Respondent's testimony does not dispel his lack of interest. He testified that between July 31 and December 15, 1992, he inquired one time into the whereabouts of A.S.V., and someone told him she was in foster care, but he never asked where the foster parents lived, or how or if he could see A.S.V. He also testified that from July 31, 1992, through December 15, 1992, he "may" have asked once how A.S.V. was doing. Respondent initially testified that he never asked anyone for a picture of A.S.V., but he later changed his testimony and stated that, at some unspecified time, he asked someone at DCFS for a picture of A.S.V., but that someone told him he could not have a picture of A.S.V.

Respondent testified that he did not inquire more about A.S.V. because this was the first time he had ever been involved in anything like this. "I had no idea what I could do, what I couldn't do. I asked a few questions. I was told no to those questions." Respondent could not remember what questions he asked. When respondent was asked, by his attorney, why he did not sign the surrenders before changing his mind, respondent testified:

> "I was a little confused about everything that was happening. \*\*\* I get a message that [M.Y.] has had a baby and that it's mine and that I need to call her or try to get in touch with her. Three or four days later she's giving up the baby for adoption. She's still telling me that it's my baby. \*\*\* [A]ll these people started calling me telling me to come and sign this and that, you know. They wanted me to come down as soon as possible or get in touch with them about signing surrender papers and I didn't know what to do. I didn't have, you know, I didn't want to go to anyone, you know, with my problem and I didn't know what to do. I just didn't do anything."

## II. LAW REGARDING ADOPTION

Before a court may completely and irrevocably sever the rights of a parent to his or her natural child, absent the parent's voluntary consent, due process requires that the State prove the allegations of unfitness by at least clear and convincing evidence. (*In re Enis* (1988), 121 Ill. 2d 124, 520 N.E.2d 362, citing *Santosky v. Kramer* (1982), 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388.) In the case at bar, the State alleged that respondent was unfit on the basis of his failure to

demonstrate a reasonable degree of interest, concern, or responsibility as to the welfare of a newborn child during the first 30 days after its birth. (750 ILCS 50/1(D)(l) (West 1992).) The trial court's decision, in this case that the State had not met its burden of proving respondent unfit, must be affirmed unless it is against the manifest weight of the evidence. *In re Adoption of Syck* (1990), 138 Ill. 2d 255, 562 N.E.2d 174.

When considering the issue of the parent's unfitness, the court is not to consider the child's best interests, as the issue of the child's best interests is only relevant after the parent has been determined to be unfit. (*Syck*, 138 Ill. 2d 255, 562 N.E.2d 174.) At the unfitness hearing, relevant evidence includes the parent's past conduct in relation to the child, the circumstances of the parent's life, and any other evidence that the court determines to be relevant to the particular ground of unfitness alleged. *Syck*, 138 Ill. 2d 255, 562 N.E.2d 174.

When the State alleges that the parent is unfit for failure to demonstrate a reasonable degree of interest, concern, or responsibility as to the welfare of a newborn child during the first 30 days after its birth (750 ILCS 50/1(D)(l) (West 1992)), the parent is also charged with a responsibility to the child. In a case construing section 1(D)(l), the First District Appellate Court set forth the parent's burden:

"As can be readily observed, the legislature, in enacting section 1(D)(l), has imposed quite an exacting burden upon natural parents in a position such as that of respondent. Nonetheless, that burden is unequivocal and requires that a parent *affirmatively show a commitment to his child within 30 days of birth* in order to ensure that proper provisions can be made for the child's permanent placement, if necessary, as soon after birth as is reasonably possible." (Emphasis added.) *In re Adoption of J.R.G.* (1993), 247 Ill. App. 3d 104, 110, 617 N.E.2d 377, 381.

A parent's fitness is not determined by his or her success but rather by the efforts he or she makes to communicate with or show an interest in the child. (*Syck*, 138 Ill. 2d 255, 562 N.E.2d 174.) Each adoption case is *sui generis*, unique unto itself, and must be determined upon the particular facts and circumstances of that case. (*Syck*, 138 Ill. 2d 255, 562 N.E.2d 174.) The circumstances that our supreme court has found to be relevant in other cases to the determination of whether a parent maintained a reasonable degree of interest, concern, or responsibility for a child are: lack of financial resources or poverty, difficulty in obtaining transportation to see the child, actions or statements of others that hinder or discourage a parent's involvement with the child, and whether the parent's failure to visit the child was motivated by a need to cope with other

aspects of the parent's life, such as the need to care for other family members or mental retardation or medical problems of the parent, rather than true indifference. *Syck*, 138 Ill. 2d 255, 562 N.E.2d 174; *In re Paul* (1984), 101 Ill. 2d 345, 461 N.E.2d 983.

Nevertheless, even extreme circumstances of a parent's life that make it difficult for the parent to maintain a relationship or visit the child do not excuse a complete lack of communication or interest in one's child. (*Syck*, 138 Ill. 2d 255, 562 N.E.2d 174.) Mitigating circumstances, such as poverty, "bear on the reasonableness of the communication a parent maintains and the interest a parent demonstrates in his or her child." (*Syck*, 138 Ill. 2d at 280-81, 562 N.E.2d at 186.) In the case at bar, the State proved by at least clear and convincing evidence that respondent failed to demonstrate any interest, concern, or responsibility for his newborn child not only during the first 30 days of her life but during the first 4½ months of her life. Therefore, the trial court's decision that respondent's parental rights should not be terminated is against the manifest weight of the evidence.

## III. ANALYSIS

The trial court's order that respondent's parental rights should not be terminated is based upon the premise that the first 30 days of A.S.V.'s life were a time of uncertainty and that, "in his own mind," respondent did not believe that he was the natural father of A.S.V. However, what respondent believed "in his own mind" would be relevant only if he had made any effort to show interest, concern, or responsibility for A.S.V., but it is not the final test. The test is whether his efforts demonstrated a *reasonable degree* of interest, concern, or responsibility for A.S.V.'s welfare during the first 30 days of her life. (750 ILCS 50/1(D)(l) (West 1992).) Respondent failed to show any interest, concern, or responsibility for A.S.V. for the first 4½ months of her life. Without *some* effort on his part, we cannot say that he has demonstrated a *reasonable degree* of interest in A.S.V.

Granted, A.S.V.'s mother, M.Y., told respondent, while she was pregnant with A.S.V., that he was not the father. Additionally, respondent's reliance upon M.Y.'s statement that he was not the father, during the pregnancy, was not unreasonable. M.Y. lived hundreds of miles from respondent and told him that she was having sexual relations with another man. However, M.Y. informed respondent that he was A.S.V.'s father while A.S.V. was no more than five days old. Respondent learned that M.Y. named him as the natural father in an affidavit as a part of surrendering her own parental rights to A.S.V. Respondent knew that DCFS and Catholic Charities

considered him to be the father. Respondent knew that he had sexual intercourse with M.Y. around the time she would have conceived A.S.V. And respondent knew that he and M.Y. were capable of conceiving children together, since they were already the parents of three children in the three years prior to A.S.V.'s birth.

Respondent's testimony was replete with statements that DCFS had not told him that he could see A.S.V., that DCFS had not informed him that he could obtain a paternity blood test, and that he just did not know what to do. However, we do not find the actions or omissions of DCFS to be the sort of mitigating factor envisioned by our supreme court. Unlike the facts of the recent case of *In re Petition of Doe* (1994), 159 Ill. 2d 347, 638 N.E.2d 181, respondent knew that the baby had been born and that the mother, DCFS, and Catholic Charities considered him to be the father. No one hid the baby or lied to him about the baby's birth or parentage. Respondent knew that A.S.V.'s mother had surrendered her own parental rights. He knew that DCFS was going forward with the adoption process, and yet he encouraged and participated in the adoption process, to the extent of contacting the Chicago DCFS office at least once to try to surrender his parental rights. He knew or should have known that someone else would have to care for A.S.V., or she would die.

Respondent chose to disregard all allegations that he was the father. He chose, knowing that he might be the baby's father, to tell DCFS that he would cooperate in any way possible with the adoption. He chose, for 4¹/₂ months, to tell DCFS that he did not want any responsibility for the child. We cannot agree with the trial court that respondent "has sincerely and forcibly communicated his desire to be involved" in A.S.V.'s life during the relevant time period, her first 4¹/₂ months of life.

Nor are the other circumstances of respondent's life sufficient to preclude a finding of unfitness. Respondent is poor, but not without an income. He is intelligent enough to have completed two years of college. There is no evidence that respondent suffers from any mental or physical disability. He is not alone in the world. Since before A.S.V. was born, respondent has lived with his son, his mother, and his brother. Respondent's explanation for not wanting his mother to find out about the adoption is contrary to any inference that he was concerned for A.S.V. If he were genuinely concerned, he should have enlisted all family support to help him make arrangements to care for his infant daughter or at least express an interest in her existence.

Respondent testified that he could not make the trip to Effingham to pick up M.Y. and A.S.V. and the other children, but he also testified that he told a DCFS worker, on the same day M.Y.

surrendered her parental rights to A.S.V., that he did not want any responsibility for A.S.V. and would cooperate fully with the adoption process. Even if we give respondent the benefit of doubt that he could not afford a bus or train ticket from Chicago to Effingham, still his income and purported lack of transportation should not have hindered him from asking about A.S.V. in any one of the several telephone conversations with M.Y. and DCFS workers in the first month of A.S.V.'s life or thereafter.

Respondent cannot hide behind statements that he did not know that he was A.S.V.'s father, because he did nothing to determine the paternity of the child. Our legislature has determined that a father who is unmarried to a baby's mother may evidence an intent to forego his parental rights to the child if he fails to commence legal proceedings to establish his paternity within the first 30 days of being informed that he is the child's father. (750 ILCS 50/1(D)(n) (West 1992).) Not only did respondent fail to commence legal proceedings to determine A.S.V.'s paternity within the first 30 days after he was informed of being her father, he never commenced such proceedings. We realize that a purported father, especially a teenager, may be confused and uncertain for a period of time after being named as the father, but respondent's uncertainty for $4^1/2$ months as to the fatherhood of A.S.V. cannot amount to an affirmative showing of a commitment to the child within 30 days after birth.

In two separate sections of the Adoption Act, our legislature has unequivocally mandated that a parent of a newborn child must demonstrate his interest, concern, or responsibility as to the welfare of the child within a 30-day period. (750 ILCS 50/1(D)(l), 1(D)(n) (West 1992).) The legislature recognizes that newborn infants are absolutely dependent upon others for their very life. Even respondent recognized that "two months is a real long time" in terms of the life of an infant. The trial court stated that by the time respondent "was convinced that the child was his, the baby had already been swept into *** protective custody." The fault, however, of the child being swept into protective custody lies with the respondent, not DCFS. We must follow the law and find that by waiting $4^1/2$ months to assert any interest in A.S.V., respondent has failed to demonstrate a reasonable degree of interest, concern, or responsibility as to A.S.V.'s welfare.

For all of the reasons stated, we reverse the trial court's order of September 28, 1993, and remand the case for the trial court to enter an order terminating respondent's parental rights as to A.S.V.

Reversed and remanded.

MAAG, P.J., and GOLDENHERSH, J., concur.