688 N.E.2d 1215 (1997)
228 Ill.Dec. 238
In re A.S.B., a Minor (Yamal Aich-Sindino, Petitioner-Appellant,
v.
The Department of Children and Family Services; John Doe et al., Respondents-Appellees (The People of the State of Illinois, Plaintiff,
v.
S.B., Defendant)).
No. 2-97-0305.
Appellate Court of Illinois, Second District.
December 29, 1997.
*1218 Patrick J. Keane, John S. Noble, Weiler & Noble, P.C., Geneva, for Yamal Aich.
Debra Smilie Brauer, Aurora, for Department of Children & Family Services.
Phyllis J. Perko, Law Offices of Harlovic & Perko, West Dundee, for A.S.B.
David R. Akemann, Kane County State's Attorney, Divia Kamal Sarang, Assistant State's Attorney, St. Charles, Martin P. Moltz, Deputy Director, Cynthia N. Schneider, State's Attorney Appellate Prosecutor, Elgin, for the People.
Justice BOWMAN delivered the opinion of the court:
Petitioner, Yamal Aich-Sindino, appeals from the adoption court's order granting the Department of Children and Family Services' (DCFS) motion to strike his petition for leave to intervene in the adoption proceeding of A.S.B. He is opposed by both the State and the adoptive parents (collectively, respondents). We affirm.
This case includes a somewhat detailed factual and procedural history. On February 15, 1995, DCFS took A.S.B. into custody after the child was abandoned by her natural mother, S.B. After the juvenile court held an initial adjudicatory hearing on February 16,1995, a process server attempted to serve S.B. at her last known address. The summons was returned unserved because the address was vacant. The process server then unsuccessfully attempted to locate S.B. via telephone directory assistance. On February 24, 1995, the process server filed an affidavit of due diligence and stated that she was unable to locate S.B. S.B. was served with notice by publication on March 23,1995.
On April 18, 1995, a default judgment was entered against S.B. At that time, the State indicated that A.S.B.'s father, Joseph Youkhanna, was currently incarcerated; the record is unclear as to how the State knew of Youkhanna. On April 19, 1995, DCFS filed an affidavit of diligent search detailing its efforts in attempting to locate S.B. For example, DCFS called S.B.'s maternal great grandmother and her cousin, visited all prior addresses listed in her DCFS file, and checked with the Department of Public Aid.
On June 5,1995, S.B. and A.S.B. submitted to blood testing. On June 22, 1995, Youkhanna agreed to submit to a paternity test. On June 30, 1995, a blood test revealed that Youkhanna was not A.S.B.'s father. On August 31, 1995, a DCFS official informed the *1219 juvenile court that she knew "of no other father that mama has named." As a result, the juvenile court again ordered DCFS to attempt to locate S.B.
On October 12, 1995, DCFS filed another affidavit of dihgent search. In the affidavit, DCFS stated that it had no contact with S.B. after the June 5 blood test. Moreover, DCFS had sent two certified letters to S.B.'s last known address; DCFS did not receive a response to either letter. The affidavit concluded that, because S.B. could not be located, it would not be possible for DCFS to inquire about the identity of A,S.B.'s natural father.
On November 2, 1995, notice by publication for an adjudicatory hearing for unknown fathers of A.S.B. was effectuated in the Geneva Republican newspaper. On November 14, 1995, the juvenile court entered a default order against all unknown fathers regarding the adjudication of their rights. On November 9, 16, and 23, notice by publication for termination of parental rights of unknown fathers of A.S.B. was effectuated in the Geneva Republican. On December 26, 1995, the juvenile court entered a default order against all unknown fathers regarding the termination of their parental rights. On January 25, February 1, and 8, 1996, S.B. was served with notice by publication regarding the termination of her parental rights. She appeared in court on March 1, 1996, and surrendered her parental rights.
On April 11, 1996, the juvenile court held a hearing and determined that it was in A.S.B.'s best interests to terminate the parental rights of unknown fathers and to grant adoptive rights to interested parties. On July 3, 1996, the adoptive parents filed their petition for adoption. On August 29, 1996, petitioner's name appeared, for the first time in the record, in a DCFS report. The report indicates that S.B. stated petitioner was A.S.B.'s father. The report also indicates that "the Putative Father Registry was checked. No one has registered as father of [A.S.B.]" DCFS repeated this exact information in a status report dated September 30, 1996.
On December 2, 1996, petitioner appeared in the adoption court and claimed to be the putative father. At that time, the adoption court noted that (1) the State had initially proceeded with the father as named by S.B. and that blood testing had excluded Youkhanna as the father; (2) DCFS proceeded and published against all unknown fathers because S.B. had not provided any other names; and (3) DCFS had filed an affidavit of dihgent search as early as October 1995, wherein it stated that no additional information could be obtained regarding a possible father because S.B. could not be located. Petitioner informed the adoption court that, after two of S.B.'s relatives had told him that Youkhanna was the father, he "just left it alone." Then, late in November 1996, he encountered another individual who told him that "everything was a he" and that there was a possibility that he was A.S.B.'s father.
On December 19, 1996, A.S.B.'s adoption was finalized without notice to petitioner. DCFS informed the adoption court of this finaKzation by letter dated December 23, 1996. The letter was file-stamped December 30,1996.
On December 30, 1996, petitioner filed a petition for leave to intervene in the adoption proceedings. In it, he claimed that S.B. had lied and misled him regarding paternity, so he had not taken any action to preserve his rights prior to November 1996.
On February 14, 1997, the adoption court issued an order granting DCFS' motion to strike the petition for leave to intervene. The adoption court determined that petitioner had not shown a sufficient interest in A.S.B. during the first 30 days after her birth. Additionally, the adoption court found that although petitioner was given notice in November 1995 of the case involving A.S.B., when she was already Vk years old, he did not pursue his paternity claim until more than one year later. Accordingly, the adoption court granted DCFS' motion to strike his petition for leave to intervene, discharged DCFS, and dismissed the case.
Petitioner thereafter filed this appeal. On appeal, petitioner has three principal contentions: (1) the juvenile court violated his due process rights by terminating his parental rights without notice; (2) the statutory *1220 scheme governing the termination of his parental rights and the adoption of A.S.B. violated his equal protection rights; and (3) the adoption court erred in striking his petition for leave to intervene.

I
Petitioner's first contention on appeal is that the juvenile court violated his due process rights when it terminated his parental rights without notice. In support of this contention, petitioner argues that (1) it was error for the juvenile court to terminate his parental rights because DCFS did not exercise due diligence during default proceedings against unknown fathers; and (2) the adoption court improperly granted the judgment of adoption after he first appeared in court. Respondents initially reply that the record belies petitioner's argument that DCFS did not exercise due diligence in attempting to determine the identity of A.S.B.'s father and that any inquiry must be limited to an examination of DCFS' actions before the entry of the default judgment as to parental rights on December 26, 1995. Moreover, respondents argue that petitioner had no right to notice of the adoption proceeding and its finalization on December 19, 1996, because his parental rights had already been terminated.

A
Petitioner's due diligence argument is governed by section 2-16(2) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-16(2) (West 1994)). This section states, in pertinent part, that where a party's usual place of abode is unknown, "a diligent inquiry shall be made to ascertain" his current and last known address. 705 ILCS 405/2-16(2) (West 1994). If diligent inquiry does not reveal the party's location, then opposing counsel is required to file an affidavit stating as such and indicating what efforts were made to effectuate service. 705 ILCS 405/2-16(2) (West 1994). After receiving this affidavit, the clerk of the court must then issue service by publication. 705 ILCS 405/2-16(2) (West 1994).
The parties do not cite any authority, and our research has riot revealed any, which defines "due diligence" in the context of section 2-16(2) of the Act (see 705 ILCS 405/2-16(2) (West 1994)). However, we believe that "due diligence" is a universal concept and one which may reasonably include "that kind of search or investigation which a diligent person, intent on ascertedning' a fact, would usually arid ordinarily make." In re Application of the County Collector for Judgment & Order of Sale Against the Lands & Lots Returned Delinquent for Nonpayment of General Taxes for the Year 1987 & Prior Years, 278 Ill.App.3d 168, 172, 214 Ill.Dec. 969,662 N.E.2d 535 (1996). When examining the facts of this case in light of this common "due diligence" standard, it is apparent that DCFS satisfied its statutory burden.
In its initial effort to locate A.S.B.'s natural father, the State first attempted to serve a summons upon the natural mother, S.B. The summons was returned unserved. The process server also unsuccessfully attempted to locate S.B. via telephone directory assistance. The process server filed an affidavit of due diligence describing her efforts. DCFS also filed several affidavits of due diligence, wherein it described the efforts it made in attempting to locate S.B. Such efforts included contacting S.B.'s relatives, checking her records with the Department of Public Aid, and visiting previously listed addresses. After the State became aware of Youkhanna's identity, it obtained a writ for his presence in court and his consent to paternity testing. A paternity test revealed that he was not A.S.B.'s father. The State was unable to contact S.B. after she appeared for blood testing. Thereafter, notice by publication was made against all unknown fathers, both for an adjudicatory hearing and then for the termination of parental rights hearing. A default judgment was entered against all unknown fathers on December 26, 1995, thereby terminating their parental rights.
As the foregoing makes clear, the State and DCFS in particular made several attempts to locate S.B. to determine the identity of A.S.B.'s father. Youkhanna was the only person S.B. named as the father before the termination of all unknown fathers' parental rights. Prior to that termination, it is apparent that DCFS conducted "that kind of *1221 search or investigation which a diligent person, intent on ascertaining a fact, would usually and ordinarily make." In re Application of the County Collector, 278 Ill.App.3d at 172, 214 Ill.Dec. 969, 662 N.E.2d 535. We therefore conclude that DCFS engaged in a diligent inquiry for A.S.B's father prior to filing its affidavit and requesting notice by publication. See 705 ILCS 405/2-16(2) (West 1994).
We note that petitioner also argues that the State did not conduct a dihgent inquiry because it subsequently learned of his identity after the default judgment was entered. However, petitioner cites no authority in support of this proposition. We know of no precedent that would require the State to conduct a second dihgent inquiry after it had completed its initial dihgent inquiry pursuant to the Act. The Act makes no mention of such a procedure. See 705 ILCS 405/2-16(2) (West 1994). Once the State conducted a dihgent inquiry in search of A.S.B's father, memorialized that inquiry in an affidavit, requested notice by publication, and proceeded while such notice was effectuated, the State's responsibility under the Act was complete. See 705 ILCS 405/2-16(2) (West 1994). Under petitioner's argument, the juvenile court would be forced to reopen the default judgment against all unknown fathers almost a year after its entry because S.B. chose to name a second possible father after December 26, 1995. Such a result would obviously eviscerate the purpose of notice by publication and is without support in the Act.

B
We next address whether the juvenile court erred in terminating the parental rights of all unknown fathers including petitioner. Parental rights and responsibilities, despite their societal and personal importance, may be terminated when a parent is adjudicated unfit pursuant to statute. In re J.F., 248 Ill.App.3d 1, 5, 187 Ill.Dec. 698, 618 N.E.2d 289 (1992). However, because each case involving parental unfitness is sui generis, courts generally do not make factual comparisons to other cases. In re S.J., 233 Ill.App.3d 88, 113, 174 Ill.Dec. 259, 598 N.E.2d 456 (1992). To effectuate the termination of parental rights, the State need only prove one statutory factor of unfitness (In re J.T.C., 273 Ill.App.3d 193, 198, 209 Ill.Dec. 881, 652 N.E.2d 421 (1995)) by clear and convincing evidence (In re V.O., 284 Ill. App.3d 686, 690, 220 Ill.Dec. 527, 673 N.E.2d 439 (1996)). In other words, a reviewing court need not consider other findings of unfitness when there is sufficient evidence to satisfy any one statutory ground. S.J., 233 Ill.App.3d at 114-15, 174 Ill.Dec. 259, 598 N.E.2d 456. A finding of parental fitness is accorded great deference on review (V.O., 284 Ill.App.3d at 690, 220 Ill.Dec. 527, 673 N.E.2d 439) and will not be reversed unless it is against the manifest weight of the evidence (In re B.R., 282 Ill.App.3d 665, 670, 218 Ill.Dec. 404, 669 N.E.2d 347 (1996)).
Where the State alleges that a person is unfit because of a failure to demonstrate a reasonable degree of interest, concern, or responsibility to a newborn child (see 750 ILCS 50/1(D)(1) (West 1994)), fitness is determined by the efforts the person makes to communicate with or show interest in the child. In re Adoption of A.S.V., 268 Ill.App.3d 549, 557, 205 Ill.Dec. 944, 644 N.E.2d 500 (1994). Even extreme circumstances that impede the parent's ability to develop a relationship with the child do not excuse a complete lack of communication or interest in the child. A.S.V., 268 Ill.App.3d at 558, 205 Ill.Dec. 944, 644 N.E.2d 500.
In this case, at the termination hearing, the juvenile court first; considered whether the unknown fathers had maintained a reasonable degree of interest, concern, or responsibility for A.S.B. The trial court found "a total lack of any contact between any fathers and the minor child, so certainly the State proved that province [sic] by clear and convincing evidence." The juvenile court also noted that, "it's very clear and cannot be disputed that no fathers ever surfaced" within the first 30 days after A.S.B.'s birth. Nothing in the record contradicts the juvenile court's findings. The State proved, by clear and convincing evidence, that petitioner and all unknown fathers failed to demonstrate any interest, concern, or responsibility for A.S.B. not only during the first 30 days of her life but also during the first several years of her life. Accordingly, we find that the *1222 juvenile court's decision to terminate the parental rights of all unknown fathers, including petitioner, was not against the manifest weight of the evidence. See B.R., 282 Ill. App.3d at 670, 218 Ill.Dec. 404, 669 N.E.2d 347.
Petitioner argues that he was "thwarted" from demonstrating interest, concern, or responsibility for A.S.B. by S.B.'s representations to him. According to petitioner, S.B. and her relatives told him that he was not A.S.B.'s father and that Youkhanna was the child's father. After hearing this information, petitioner "took no action to pursue the possibility of his own paternity." He now asserts that "it was reasonable to rely on [S.B.'s] representations." Therefore, his failure to timely assert his rights should now be excused, even though the termination and adoption proceedings are complete.
Petitioner's argument is untenable. As noted, we found no error in the determination of unfitness pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1994)). This section imposes a substantial burden on natural parents to demonstrate a reasonable degree of interest, concern, or responsibility for a child during the first 30 days after its birth. In re Adoption of J.R-G., 247 Ill.App.3d 104, 110, 187 Ill.Dec. 169, 617 N.E.2d 377 (1993). The burden is "unequivocal and requires that a parent affirmatively show a commitment to his child within 30 days of birth." J.R.G., 247 Ill. App.3d at 110, 187 Ill.Dec. 169, 617 N.E.2d 377. Thus, what a putative father believes in his own mind is relevant "only if he had made any effort to show interest, concern, or responsibility" for a child. A.S.V., 268 Ill. App.3d at 558, 205 Ill.Dec. 944, 644 N.E.2d 500. In the absence of any effort on petitioner's part, we cannot conclude that he has evinced a reasonable degree of interest in A.S.B. See A.S.V., 268 Ill.App.3d at 558, 205 Ill.Dec. 944, 644 N.E.2d 500. Therefore, the juvenile court did not err in terminating the parental rights of all unknown fathers, including petitioner.

C
Petitioner further argues that the adoption court erroneously granted the judgment of adoption after it became aware of his interest as a putative father. According to petitioner, after he appeared in court on December 2, 1996, and was granted a continuance until December 30, 1996, to hire an attorney, the adoption court erred in granting the adoption decree on December 19, 1996, without notice to him. According to respondents, petitioner had no right to notice of the adoption proceeding because his rights had been previously terminated and he had not shown any interest in A.S.B. since her birth.
Petitioner's contention is, of course, based on the premise that he in fact had a due process right to notice of the adoption hearing. He had no such right. In Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the Court reviewed the constitutionality of New York's "Putative Father Registry" statute, to which Illinois' statute is substantially similar. Compare N.Y. Soc. Serv. Law § 372-c (McKinney Supp. 1982-1983) with 750 ILCS 50/12.1 (West 1994). The putative father in Lehr challenged the statute on due process and equal protection grounds after he Was not given advance notice of the adoption proceeding involving his biological daughter. The putative father did not have "any significant custodial, personal, or financial relationship" with the child and "he did not seek to establish a legal tie until after [the child] was two years old." Lehr, 463 U.S. at 262, 103 S.Ct. at 2994, 77 L.Ed.2d at 627. The Court held that New York's statutory scheme adequately protected the putative father's interests. Notably, the Court stated that, "[T]he right to receive notice was completely within [the putative father's] control. By mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt [his biological daughter]." Lehr, 463 U.S. at 264, 103 S.Ct. at 2995, 77 L.Ed.2d at 628. Thus, because the putative father in Lehr neither developed a relationship with his biological daughter nor took any affirmative action to protect his interest in establishing such a relationship, the Constitution did not require "either a trial judge or a litigant to give special notice to nonparties who are presumptively capable *1223 of asserting and protecting their own rights." Lehr, 463 U.S. at 265, 103 S.Ct. at 2995, 77 L.Ed.2d at 629.
Similarly in this case, petitioner did not establish any relationship with A.S.B. during her life. More importantly, just as the putative father in Lehr, petitioner did not avail himself of the statutory scheme that was designed to protect his inchoate interest in A.S.B.; petitioner concedes that he did not register with the Putative Father Registry. As such, he is statutorily barred from asserting that interest. See 750 ILCS 50/12.1(g) (West 1994). Consistent with the dictates of Lehr, petitioner was not entitled to receive special notice of the adoption proceeding when he was presumptively capable of protecting his interest in such notice. Thus, his due process rights were not violated.

II
Petitioner next contends that his constitutional right to equal protection was violated when his parental rights were terminated. Although it is unclear from petitioner's brief, he is seemingly challenging the constitutionality of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1994)), which defines unfit parents, and section 12.1 of the Adoption Act (750 ILCS 50/12.1 et seq. (West 1994)), which describes the Putative Father Registry. In other words, petitioner contends that the statutory scheme that governs the termination of his parental rights and the adoption of A.S.B. is unconstitutional.
At the outset, we note that petitioner's brief is also devoid of citation to any authority that governs our standard of review in a statutory challenge of constitutional proportion. Fortunately, this precedent is well settled. All legislative enactments are presumed to be constitutional (Fink v. Ryan, 174 Ill.2d 302, 308, 220 Ill.Dec. 369, 673 N.E.2d 281 (1996)), and any doubts are resolved in favor of their validity (Jost v. Bailey, 286 Ill.App.3d 872, 879, 222 Ill.Dec. 69, 676 N.E.2d 1033 (1997)). Petitioner has a heavy burden to rebut this presumption. See Jost, 286 Ill.App.3d at 879, 222 Ill.Dec. 69, 676 N.E.2d 1033.
In reviewing an equal protection claim, we must first determine whether the challenged statute impedes a fundamental right or discriminates against a suspect class. In re C.T., 281 Ill.App.3d 189, 195, 217 Ill.Dec. 219, 666 N.E.2d 888 (1996). If the statute suffers from either infirmity, then we apply the strict scrutiny test and uphold the statute's constitutionality only if it is narrowly tailored to serve a compelling state interest. C.T., 281 Ill.App.3d at 195, 217 Ill.Dec. 219, 666 N.E.2d 888. However, where the challenged statute does not affect either a fundamental right or a suspect class, we apply the rational basis test. C.T., 281 Ill.App.3d at 195, 217 Ill.Dec. 219, 666 N.E.2d 888. Under the rational basis test, our review "is limited and generally deferential." Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 37, 220 Ill.Dec. 166, 672 N.E.2d 1178 (1996). To withstand rational basis review, a statute "need only be rationally related to a legitimate state goal" and must be upheld if any set of facts "can reasonably be conceived" to justify the legislative classification. Edgar, 174 Ill.2d at 37, 220 Ill.Dec. 166, 672 N.E.2d 1178.

A
Petitioner's first equal protection challenge appears to be directed at section 1 of the Adoption Act (750 ILCS 50/1 et seq. (West 1994)), which provides for various definitions of "unfit person." At the termination hearing, the trial court found that the State had proved three separate bases for unfitness by clear and convincing evidence. The juvenile court noted that it was apparent that all unknown fathers had abandoned A.S.B. (see 750 ILCS 50/1(D)(a) (West 1994)), had failed to maintain a reasonable degree of interest, concern, and responsibility for A.S.B.'s welfare (see 750 ILCS 50/1(D)(b) (West 1994)), and had failed to maintain a reasonable degree of interest, concern, and responsibility for A.S.B.'s welfare within the first 30 days after her birth (see 750 ILCS 50/1(D)(b) (West 1994)). According to petitioner, these sections discriminate against unwed fathers and the termination of his parental rights pursuant to them violated his right to equal protection.
*1224 Under the Adoption Act, "unfit person" is defined to be "any person whom the court shall find to be unfit to have a child." (Emphasis added.) 750 ILCS 50/1(D) (West 1994). The statute then defines several grounds for unfitness, including abandonment (750 ILCS 50/1(D)(a) (West 1994)), failure to show reasonable interest, concern, or responsibility (750 ILCS 50/1(D)(b) (West 1994)), and failure to demonstrate the same during the first 30 days of the child's life (750 ILCS 50/1(D)(l) (West 1994)).
As is obvious, the statute is written in gender-neutral language. It does not create a sex-based classification because "any person" may be judicially deemed to be unfit. See 750 ILCS 50/1(D) (West 1994). The Adoption Act therefore does not discriminate against a suspect class. See Frontiero v. Richardson, 411 U.S. 677, 682, 93 S.Ct. 1764, 1768, 36 L.Ed.2d 583, 589 (1973) (suspect classifications include only race, sex, alienage, and national origin); People ex rel. Difanis v. Barr, 78 Ill.App.3d 842, 848, 34 Ill. Dec. 223, 397 N.E.2d 895 (1979), aff'd, 83 Ill.2d 191, 46 Ill.Dec. 678, 414 N.E.2d 731 (1980) (distinction not based on gender subject only to rational basis review).
Moreover, the Adoption Act does not burden a fundamental right. Of course, the interest of a parent in the care and custody of his child is fundamental. C.T., 281 Ill.App.3d at 195, 217 Ill.Dec. 219, 666 N.E.2d 888. However, where a parent never establishes a "custodial, personal, or financial relationship" with a child or merely abandons the child, the Constitution does not grant him that fundamental right of parenthood. Lehr, 463 U.S. at 267-68, 103 S.Ct. at 2996-97, 77 L.Ed.2d at 630. As the facts of this case make clear, petitioner did not establish a "custodial, personal, or financial relationship" with A.S.B. at any time during her life. As such, he cannot now claim to have a fundamental right. See Lehr, 463 U.S. at 267-68, 103 S.Ct. at 2996-97, 77 L.Ed.2d at 630. Absent a burden on a fundamental right, or discrimination against a suspect class, we review the challenged statutory provisions under the rational basis test.
After reviewing the definition of "unfit person" under the highly deferential rational basis test (see Edgar, 174 Ill.2d at 37, 220 Ill.Dec. 166, 672 N.E.2d 1178), we conclude that the statute is reasonably related to a legitimate governmental interest. The overriding concern of the Adoption Act is the best interests of the child at issue. In re Marriage of T.H., 255 Ill.App.3d 247, 253, 193 Ill.Dec. 370, 626 N.E.2d 403 (1993). While the termination of parental rights should not be treated lightly (see In re Dawn H., 281 Ill.App.3d 746, 755, 217 Ill.Dec. 396, 667 N.E.2d 485 (1996)), terminating those rights when a child's welfare is at issue constitutes a legitimate state interest. The legislature has fashioned several definitions of "unfit person" which, if proved by clear and convincing evidence, allow for the termination of parental rights. See 750 ILCS 50/1(D) (West 1994). It is unassailable that each of the challenged definitions of "unfit person" is reasonably related to the State's interest in terminating parental rights in favor of the best interests of a child. For example, it is axiomatic that a parent who has abandoned a child, or has failed to demonstrate concern, interest, or responsibility during the first 30 days of a child's life reasonably qualifies as an "unfit person" for parenthood purposes. Moreover, petitioner has set forth nothing to satisfy his steep burden of proving the unconstitutionality of the challenged provisions of the Adoption Act. See Bailey, 286 Ill.App.3d at 879, 222 Ill.Dec. 69, 676 N.E.2d 1033. The provisions are rationally related to a legitimate state goal. See Edgar, 174 Ill.2d at 37, 220 Ill. Dec. 166, 672 N.E.2d 1178. Accordingly, we find no equal protection violation.

B
Petitioner's second equal protection challenge concerns the Putative Father Registry, as contained in section 12.1 of the Adoption Act (750 ILCS 50/12.1 (West 1994)). The Putative Father Registry serves to aid in determining the identification and location of putative fathers. 750 ILCS 50/12.1 (West 1994). Under this section, any putative father of a minor child must register with DCFS before the child's birth, but no later than 30 days after the child's birth. 750 *1225 ILCS 50/12.1(b) (West 1994). A putative father who fails to register within the time allotted "is barred from thereafter bringing or maintaining any action to assert any interest in the child." 750 ILCS 50/12.1(g) (West 1994). However, if the putative father can prove by clear and convincing evidence that it was not possible for him to register within the allotted time (750 ILCS 50/12.1(g)(l) (West 1994)), that his failure to register was not his fault (750 ILCS 50/12.1(g)(2) (West 1994)), and that he registered within 10 days after it became possible for him to do so (750 ILCS 50/12.1(g)(3) (West 1994)), then he is allowed to assert his interest in the child.
As is apparent, the Putative Father Registry is a gender-based classification. Legislative classifications based on gender are reviewed using the intermediate level of scrutiny. Edgar, 174 Ill.2d at 33, 220 Ill.Dec. 166, 672 N.E.2d 1178; Jacobson v. Department of Public Aid, 171 Ill.2d 314, 322-23, 216 Ill.Dec. 96, 664 N.E.2d 1024 (1996). The intermediate level of scrutiny "requires that the statutory classification be substantially related to an important governmental objective." In re Custody of D.A., 201 Ill.App.3d 810, 817, 146 Ill.Dec. 1021, 558 N.E.2d 1355 (1990).
As noted in the statute, the Putative Father Registry serves to aid in identifying and locating putative fathers. By using the Putative Father Registry, putative fathers can protect their interests in their biological children. The Putative Father Registry also serves to facilitate adoptions; where a search of the registry does not reveal a putative father, a presumption arises that no putative father exists and the adoption can proceed. As previously discussed, it is axiomatic that these concerns represent important governmental interests. The registration provisions are substantially related to these interests. Any man who has sexual relations with a woman can register confidentially, at any time before childbirth and up to 30 days thereafter, to protect his rights. Moreover, if he can prove that his ability to register was somehow impeded, then the statute provides him with even more time to register. The Putative Father Registry is therefore substantially related to important state interests. See D.A., 201 Ill.App.3d at 817, 146 Ill.Dec. 1021, 558 N.E.2d 1355. Once again, petitioner has failed to satisfy his burden of proving the unconstitutionally of the statute. See Bailey, 286 Ill.App.3d at 879, 222 Ill.Dec. 69, 676 N.E.2d 1033. Thus, his equal protection rights were not violated.
Finally, we note that our conclusion is again supported by the Supreme Court's decision in Lehr. In Lehr, the Court distinguished between two classes of unwed fathers. Those fathers who demonstrate "a full commitment to the responsibilities of parenthood" are afforded constitutional protection for their interests in personal contact with their children. Lehr, 463 U.S. at 261, 103 S.Ct. at 2993, 77 L.Ed.2d at 626. On the other hand, where a father does not accept "some measure of responsibility for the child's future," the Constitution "will not automatically compel a State to listen to his opinion of where the child's best interests lie." Lehr, 463 U.S. at 262, 103 S.Ct. at 2994-95, 77 L.Ed.2d at 627. The Court held that, because the putative father did not establish any "custodial, personal, or financial relationship" with the child (Lehr, 463 U.S. at 267, 103 S.Ct. at 2996, 77 L.Ed.2d at 630), his rights differed from those of the mother and were not entitled to the same constitutional protection (Lehr, 463 U.S. at 267-68, 103 S.Ct. at 2996-97, 77 L.Ed.2d at 630-31). As such, the putative father registry and its application to the father were consistent with the principles of equal protection.
Petitioner in the instant case acted similarly to the putative father in Lehr. Petitioner did not establish a "custodial, personal, or financial relationship" with A.S.B. at any time during her life. Moreover, he did not seek to establish a legal tie to A.S.B. As such, a possible biological connection to A.S.B. does not trigger constitutional protection for any interest petitioner may have asserted several years after A.S.B.'s birth and nearly one year after her adoption was finalized. Neither the Putative Father Registry nor its application to petitioner violates equal protection principles.

III
Petitioner's final contention is that the adoption court erred in striking his petition *1226 for leave to intervene. Specifically, petitioner argues that he could not demonstrate a reasonable degree of interest and concern in A.S.B. because he was "thwarted from asserting" such interest and concern by S.B. According to respondents, the adoption court correctly struck the petition for leave to intervene and terminated petitioner's parental rights; because petitioner's rights are independent of S.B.'s, his reliance on her representations was misplaced.
Initially, we note that, as previously mentioned, petitioner concedes that he did not register at any time with the Putative Father Registry. He is therefore statutorily barred from bringing any action to assert any interest in A.S.B. See 750 ILCS 50/12.1(g) (West 1994). On this ground alone, it was proper for the adoption court to strike his petition for leave to intervene. We further note that, because petitioner has no parental rights in A.S.B., he has no standing to pursue any interests in an adoption case. See 750 ILCS 50/5(B)(f)(l) (West 1994) (parents shall not be made parties to an adoption proceeding if their rights have been terminated). It was also proper for the trial court to deny petitioner leave to intervene on this ground. We recognize that the adoption court did not expressly employ either of these rationales when it struck the petition for leave to intervene. However, it is well established that we may affirm a trial court's decision on any basis appearing in the record. Trustees of Wheaton College v. Peters, 286 Ill.App.3d 882, 887, 222 Ill.Dec. 212, 677 N.E.2d 25 (1997). Accordingly, we determine that the adoption court's decision to strike the petition for leave to intervene was not error.
Our decision is unchanged when we consider the rationale expressed by the adoption court. In its February 14, 1997, order, the trial court granted DCFS' motion to strike the petition for leave to intervene because petitioner "failed to demonstrate a reasonable degree of interest in this minor child" pursuant to section 1(D)(1) of the Adoption Act (750 ILCS 50/1(D)(l) (West 1994)). We have already determined that this finding is not against the manifest weight of the evidence. We have also previously determined that petitioner's utter failure to demonstrate any interest in A.S.B. cannot be excused by his belief that S.B. "thwarted" his otherwise good intentions. Accordingly, it was not error for the adoption court to deny petitioner leave to intervene in the adoption proceeding.

CONCLUSION
For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.
Affirmed.
DOYLE and COLWELL, JJ., concur.