FOURTH DIVISION
September 30, 2016

2016 IL App (1st) 160850

No. 1-16-0850

| | | |
|---|---|---|
| *In re* Jamari R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | 07 JA 386 |
| v. | ) | |
| | ) | |
| Keith B., | ) | Honorable |
| | ) | Demetrios G. Kottaras, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

OPINION

¶ 1     Following the trial court's entry of an order terminating the parental rights of the father of

Jamari R., the father appealed that decision arguing that he had not been properly served prior to

appearing in the proceedings where the State's service by publication listed the incorrect last

name of Jamari and his mother and where the Department of Children and Family Services

(DCFS) and the State did not conduct a diligent inquiry in locating him. For the reasons that

follow, we reverse the trial court's order terminating the father's parental rights and remand this

matter to the trial court for further proceedings consistent with this order.

¶ 2                                        BACKGROUND

¶ 3     Jamari was born on May 21, 2007. On June 1, 2007, the State filed a petition for

adjudication of wardship of Jamari. In that petition, the State incorrectly spelled the minor's

name as "Jabari [Spelling 1]," [1] and incorrectly spelled the mother's name as "Shavelle [Spelling 1]" when it should have been spelled "Shavelle [Spelling 2]." The petition further stated that the father was unknown.

¶ 4    On June 1, 2007, the court conducted a temporary custody hearing. At that hearing, the mother's attorney informed the court and the parties that the mother's last name was "[Spelling 2]" not "[Spelling 1]." The attorney also informed the court and the parties that the child's last name was the same as the mother's last name, "[Spelling 2]." Later on during that hearing, the mother corrected the parties and the court that her son's first name was "Jamari" and not "Jabari." The parties, including the State, the mother and the guardian *ad litem* (GAL), entered into a stipulation at that hearing stating that Jamari's father's identity and whereabouts were unknown. The stipulation also indicated that Jamari and a child that the mother gave birth to two years prior to Jamari had both been born drug exposed, and the mother had seven other minors who were or are in DCFS custody with findings of abuse or neglect. This stipulation was signed by the mother and her attorney.

¶ 5    On the same day, the court entered an order amending the petition for adjudication of wardship to show the correct spelling of Jamari's first and last names.

¶ 6    On June 14, 2007, an affidavit for service by publication was filed stating that the fathers of Jamari and his sibling were still unknown, so they could not be found. The caption of this affidavit had the incorrect spelling of Jamari's first and last names. On August 10, 2007, notice of the pending proceedings was printed in the Chicago Sun-Times; Jamari's name was misspelled as "Jabari [Spelling 1]" and his mother's name was misspelled as "Shavelle [Spelling

---

[1] Throughout the course of these proceedings, the parties misspelled the minor and the mother's last numerous times. In order to keep the minor's identity private, we will refer to the incorrect spelling of the minor and the mother's last name as "Spelling 1" and the correct spelling of the minor and mother's last name as "Spelling 2."

1]." This notice indicated that the adjudication hearing was set for August 24, 2007, or as soon thereafter as the case could be heard.

¶ 7    On August 24, 2007, the court held a status hearing on service by publication. The caseworker for the minor, Ms. Fries, stated that no one had come forth claiming to be the father. Fries also stated that she had done a Putative Father Registry search on August 17, 2014, but there were no names of fathers in the results she received on August 21, 2014. Fries stated that when she had discussed the father with the mother, "she tends to tell me unknown."

¶ 8    When the State requested a default on the unknown fathers, one of the attorneys pointed out that there was a discrepancy in the minor's name, that the correct spelling was "Jamari [Spelling 2]" but the publication wrote "Jabari [Spelling 1]." The State then asked for the correct spelling of the minor's name, was informed that it was "Jamari [Spelling 2]," and the court thereafter allowed the State leave to republish the notice.

¶ 9    A second affidavit for service by publication was filed on August 29, 2007. This affidavit included the names "Jabari" and "Jamari" in the caption, with the correct spelling of "Jamari" as an "AKA." Jamari's last name and his mother's last name were both spelled as "[Spelling 1]." Publication with those spellings ran in the Chicago Sun-Times on October 19, 2007.

¶ 10    At the adjudication hearing on November 2, 2007, Fries testified that she had done a Putative Father Registry search in August of that year under Jamari's name, and there were no results. An affidavit of her due diligence concerning the Putative Father Registry search was admitted into evidence without objection. Jamari's first and last names were spelled correctly in the caption of the affidavit. On the State's motion, the unknown father of Jamari was defaulted. The adjudication hearing then proceeded by stipulation. It was stipulated that Jamari's father's identity and whereabouts were unknown, Jamari had been born exposed to illegal drugs, and the

mother admitted to using illegal substances while pregnant. Based on the stipulated record, the court found that Jamari had been neglected due to his exposure to a controlled substance and due to an injurious environment. The court also found that Jamari had been abused due to a substantial risk of physical injury based on the mother's history of noncompliance with services, lack of prenatal care and prior findings of neglect and abuse as relating to other siblings.

¶ 11    Dispositional and permanency hearings took place on March 20, 2008, and September 18, 2008. On September 18, 2008, the court entered an order finding the mother and unknown father of Jamari were unable to care for him. The court made Jamari a ward of the court and placed him in the guardianship of the DCFS Guardianship Administrator.

¶ 12    After several hearings on the parents' progress towards permanency goals, the court entered a permanency goal of termination of parental rights (TPR) for Jamari, and this permanency goal was entered numerous times thereafter.

¶ 13    On February 19, 2014, the State filed a "Supplemental Petition for the Appointment of a Guardian with the Right to Consent to Adoption" (TPR petition). The caption for this petition named Jamari as "Jabari [Spelling 1] AKA Jamari [Spelling 1] AKA Jamari Jamiel [Spelling 2]." The mother's name was listed as "Shavelle [Spelling 2]," and the father was listed as unknown. The petition alleged that it was in Jamari's best interest for his parents' parental rights to be terminated because he has been with his foster parents since December 13, 2012, and they desired to adopt him.

¶ 14    On April 4, 2014, a hearing on the TPR petition was held. At this hearing, the mother testified in response to the State's questioning that there was no one she wanted to name as Jamari's father. The court then inquired further, and the mother stated that the father could be James S. or "probably" Keith B. The mother then stated that Jamari's father could not be anyone

else: "Nobody else. It's going to be one or the other." The court then granted the State leave to serve Keith B. The permanency hearing continued and the court recommended a goal of termination of parental rights, noting that Jamari was in an appropriate pre-adoptive home that could meet his long-term needs.

¶ 15    On June 19, 2014, the court entered an order for parentage testing on Keith B., and an attorney was appointed on his behalf.

¶ 16    On September 24, 2014, the court entered a finding that Keith B. was Jamari's father based on DNA testing. As a result, the court ordered that the TPR petition be amended to reflect Keith B. as the father.

¶ 17    On April 2, 2015, the State filed "Requests for Admissions of Facts" directed to the mother requesting that she admit that in addition to her name of "Shavelle [Spelling 2]," she used several other aliases at one time or another, including an alias with the last name "[Spelling 1]." The State also requested that the mother admit that she had convictions for four felonies, one under each of her aliases dating back to 1996.

¶ 18    On September 18, 2015, the court granted the State's motion to amend the TPR petition to add the ground of depravity for the father of Jamari. This motion also alleged that the mother had been convicted of her fourth felony on June 29, 2015.

¶ 19    On October 8, 2015, the first hearing on the TPR petition was held. The mother was not present at this hearing, but the father was present. The father testified that he was currently housed at Danville Correctional Center. He had been incarcerated on May 10, 2013, sentenced on September 21, 2013, and was sentenced to six years at 85%. At this hearing, the State requested that the court take judicial notice of the adjudication order for Jamari entered on

November 2, 2007, and the dispositional order entered on September 18, 2008. Further, the State's requests to admit to the mother were deemed admitted as she did not file a response.

¶ 20 Rakaia Johnson, Jamari's caseworker from March 2008 to August 2012, testified at the hearing, in relevant part, that she could not do a diligent search for Jamari's father because she did not know his name. She did perform Putative Father Registry searches, though, every six months, and no father ever popped up. No one claiming to be Jamari's father ever came forward, and Jamari's father was still unknown to her when she ceased being Jamari's caseworker in March 2012. Johnson stated that while she was assigned to the case, the mother was in jail on several occasions, and she had a difficult time keeping up with the mother because she used different aliases. With respect to the father, she testified that he had not made any progress towards reunifying with Jamari in four different nine-month periods beginning on August 13, 2009, and ending on August 16, 2012.

¶ 21 Jennifer Costello, Jamari's caseworker from August 2013 to September 2015, testified at the hearing, in relevant part, that when she was assigned the case, Jamari's father was unknown. She could not do a diligent search for the father because his name was unknown and nothing came up when she conducted a Putative Father Registry search. When Costello was assigned the case, the mother was incarcerated for retail theft, and she stated that the mother's biggest impediment to reunification was her continued arrests and incarceration.

¶ 22 Costello testified that on April 4, 2014, the mother identified Keith B. as a possible father. Keith B. was confirmed to be the father in September 2014, at which time the father was incarcerated. Costello spoke to the father via phone on January 16, 2015. The father told her that prior to the DNA testing, he had no knowledge that Jamari existed. He did not know he had a son with the mother, and he had not seen the mother in 10 years. The father told Costello that he was

6

not in a position to be able to raise a child. During her conversation with the father, Costello performed an integrated assessment with the father and determined he would need services such as individual counseling, a substance abuse assessment, and a domestic violence assessment. The jail where the father was at at that time did not have any of those services, and when the father was transferred to the Illinois Department of Correction (IDOC), the only service available was substance abuse services.

¶ 23    The father told Costello that he was not able to raise his daughter, whom he lived with before being incarcerated, much less other children. The father did not ask for visits with Jamari. While Costello was Jamari's caseworker, the father made no progress towards reunifying with Jamari, and he was not due for parole until 2020 based on an armed habitual criminal conviction. Costello testified that the father never engaged in any of his recommended services and never made progress towards reunification with Jamari while she was assigned to the case.

¶ 24    Costello testified that she had never spoke with Jamari about who his father was. Jamari's caregivers said they would do that in a therapeutic setting with Jamari's therapist. At the time of her testimony in October 2015, this had not been done.

¶ 25    An integrated assessment dated February 6, 2015 was entered into evidence. In this assessment, it stated that the father was 40 years old at the time Costello interviewed him. In 1995, when he was 20 years old, he moved in with a girlfriend and had two sons with her. He made his living selling drugs and his girlfriend worked. He got a drug charge and went to the penitentiary. Several years later, he had a child with another woman and that child was born in January 2010. After he broke up with that girlfriend, he and the mother became friends and "hooked up" once. After that, the father moved in with the mother of the baby girl that was born

in January 2010, and remained there until the girl was six years old when he was incarcerated again.

¶ 26    On the State's request, the court then admitted into evidence certified statements of conviction for the mother under four different aliases as well as four certified statements of conviction for the father. The State and the GAL then rested.

¶ 27    The father testified on his own behalf. He was residing in Danville Correctional Center and had never met Jamari. He did not know about Jamari and never put his name into the Putative Father Registry. The father testified that his 1998 drug conviction was due to his being the driver in a car with someone who had narcotics. His 2002 conviction was similar in that he was "standing around the neighborhood, and [he] was doing probation." His 2003 conviction was a firearm conviction in which he was caught with a firearm at a traffic stop and served a three-year sentence. He stated that he only "hooked up" with the mother once. The father rested, and the court continued the matter to another day so that the mother's attorney could locate her and have her appear.

¶ 28    On October 16, 2015, the mother was present and addressed the court and arguments were given. The State and the GAL argued concerning unfitness. The father's attorney argued that the father had not abandoned or deserted Jamari and that he never knew he had a son with the mother. The father's attorney went on to state: "When asked by the judge, the mother denied knowing who the father was. Neither of the caseworkers ever asked the mother who the father was. No diligent search was done because no father was named." In rebuttal, the State argued that the father was in a situation of his own making and that a lot of his convictions were based on previous convictions. According to the State, the father had three other children, and no connection with any of them. Following arguments, the court found that the mother was unfit by

8

clear and convincing evidence on five grounds. Regarding the father, the judge asked if there had been a decision in his pending appeal of a criminal conviction as it could have bearing on the TPR case. The judge set a hearing date on December 14, 2015, for status on the disposition of the appeal.

¶ 29    At the December 14, 2015, hearing, it was indicated that the father's release date was June 16, 2018, and that as of November 20, 2015, the appellate defender had not yet filed anything in the father's appeal. The judge stated that he would not wait for that. The court then inquired of the foster parents how Jamari was doing. The foster father reported that Jamari was doing extremely well. He was in the school choir, he had made the honor roll again, and DCFS had been very active in getting what the foster parents needed for him.

¶ 30    On February 29, 2016, another hearing was held and still nothing had been filed in the father's criminal appeal. After arguments, the judge stated that he was extremely sympathetic to the father's situation in that he had not been informed of his paternity. However, the judge stated that he would not wait any longer on the father's criminal appeal and found the father unfit.

¶ 31    A best interest hearing followed. At the hearing, Daisy Sanchez testified that she was Jamari's caseworker since September 14, 2015. Jamari had been in his current foster home for about 2½ years. His previous placement was with family members and had been disrupted because the foster parents were incarcerated. The current home was safe and appropriate, and Jamari always seemed happy and comfortable. Jamari interacted with his foster parents like a family, and Jamari was very talkative. They seemed to have a bond with each other. Jamari's older sister had been adopted, and Jamari wondered why he had not been adopted yet. He stated several times that he wanted to be adopted. Jamari had sickle-cell trait, but there had not been any flare ups since Sanchez had been assigned the case. Jamari was not on any medications at the

time, and his grades and behavior in school had improved since he had been with these foster parents. Sanchez believed that it was in Jamari's best interest that parental rights be terminated.

¶ 32    The foster mother testified that Jamari had been in their home for almost 3½ years, since December 13, 2012. She was aware of Jamari's father and she was willing, when the time was appropriate, to allow contact between Jamari and his father. They planned to address this through Jamari's therapist. When the foster mother would ask Jamari about how he would feel if they found his father, Jamari said he did not want to talk about it.

¶ 33    The foster father testified about all the activities he did with Jamari. He stated that he and his wife came from big families so they understood how important family is. Jamari would need the relationship with his biological family, and they were preparing him for it. They would love to have the opportunity to allow contact between Jamari and his father. Jamari's therapist had known Jamari for about two years, and a lot of things were left up to her. They talked to the therapist about when Jamari should learn of his father. The foster parents wanted to keep the doors open between Jamari and his mother and father. The foster father testified that Jamari was happy and growing up.

¶ 34    The father testified on his own behalf. He felt that he should be out of prison and that he had appealed his conviction because he did not meet the requirements for armed habitual criminal. He stated he was enrolled in a parenting program at Danville Correctional Center and was also in anger management. He had four other children, ranging in age from 6 to 21. He felt like he deserved to be in Jamari's life.

¶ 35    The father stated that although he wanted to be in Jamari's life, he honestly did not think it would be fair to take him from his foster home. He "rested good at night knowing [Jamari's] in

good hands." The father was hoping he could be in Jamari's life if they could stay in touch, but his hands were tied at the moment.

¶ 36    The father stated that he had no idea that he was Jamari's father until he was brought into court for this case. His relationship with the mother consisted of texting, talking on the phone a bit, and hooking up. They were not together, they just messed around.

¶ 37    Following arguments at the conclusion of the best interest hearing, the court found that it was in Jamari's best interest to terminate parental rights and appoint the DCFS Guardianship Administrator as Jamari's guardian with the right to consent to adoption. The court then changed Jamari's permanency goal to adoption.

¶ 38    On February 29, 2016, the trial court judge issued a written termination hearing order reflecting his oral rulings that the father was unfit based on his failure to maintain reasonable interest, concern, and responsibility and failure to make reasonable efforts and progress in any and all of nine months. The order entered a permanency goal of adoption for Jamari because his parents' parental rights had been involuntarily terminated and Jamari was in a loving preadoptive home. On March 14, 2016, the father filed his notice of appeal challenging the order entered on February 29, 2016, terminating his parental rights to Jamari.

¶ 39                                    ANALYSIS

¶ 40    In this appeal, the father argues that service upon him was defective, and as a result, any orders entered prior to his appearance in the matter are void. Specifically, the father argues that service by publication was defective because (1) the publication failed to correctly identify the minor as "Jamari [Spelling 2]," (2) DCFS and the State failed to exercise due diligence in effectuating service, and (3) the father did not waive the issue of defective service because his appearance in the matter only resulted in prospective waiver of issues relating to proper service. The State and the GAL in turn argue that all of the requirements for effective service by

11

publication were met here, and even if they were not, the father waived any argument relating to service when he appeared in the matter without raising any objections to service.

¶ 41 Parents have a fundamental liberty interest in the care, custody, and control of their children, which is protected by the due process clause of the fourteenth amendment. U.S. Const., amend. XIV, § 1; *In re M.H.*, 196 Ill. 2d 356 (2001). Procedures involving the termination of parental rights must comply with the requirements of due process. *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re M.H.*, 196 Ill. 2d 356. Due process requires that notice in juvenile proceedings be equivalent to that constitutionally required in civil and criminal cases. *In re C.R.H.*, 163 Ill. 2d 263, 269 (1994) (a minor and his or her parents have a constitutional right of due process to receive adequate notice of a juvenile proceeding); see also *In re C.L.T.*, 302 Ill. App. 3d 770 (1999). Where service to a parent is defective, it does not confer personal jurisdiction to the trial court, thereby rendering any orders entered without personal jurisdiction void. *In re Dar. C.*, 2011 IL 111083, ¶ 85.

¶ 42 The Juvenile Court Act of 1987 (Juvenile Court Act) provides that when a petition is filed the clerk of the court shall issue a summons to the minor's legal guardian or custodian and to each person named as a respondent. 705 ILCS 405/2-15 (West 2012). Section 2-16 of the Juvenile Court Act governs when service by publication is permitted. This section states in pertinent part that where a respondent's usual place of abode is not known, a diligent inquiry shall be made to ascertain the respondent's current and last known address. 705 ILCS 405/2-16(2) (West 2012). If the diligent inquiry does not reveal the party's location, the Juvenile Court Act requires the petitioner's attorney to file an affidavit showing that the respondent, on due inquiry, cannot be found or is concealing his or her whereabouts so that process cannot be served. 705 ILCS 405/2-16(2) (West 2012). Publication must then be made once in a newspaper

of general circulation in the county where the action is pending. 705 ILCS 405/2-16(2) (West 2012). If the respondent fails to appear after publication has been properly effectuated, the trial court shall enter any appropriate orders of default against the respondent. 705 ILCS 405/2-21(1) (West 2012).

¶ 43    Jurisdiction of persons under the Juvenile Court Act is regulated by statute and is one of the conditions precedent to the exercise of subject matter jurisdiction. *In re L.E.J.*, 115 Ill. App. 3d 993, 997 (1983). Subject matter jurisdiction is the power of the court to adjudicate; personal jurisdiction is the ability to exercise that power as to particular individuals. *In re Shawn B.*, 218 Ill. App. 3d 374, 378 (1991). "Whether a judgment is void or voidable presents a question of jurisdiction." *People v. Davis*, 156 Ill. 2d 149, 155 (1993). "A judgment is void (as opposed to voidable) only if the court that entered it lacked jurisdiction." *People v. Raczkowski*, 359 Ill. App. 3d 494, 496-97 (2005). " 'The jurisdictional failure can be the court's lack of (1) personal jurisdiction or (2) subject matter jurisdiction, but it can also be (3) that the court lacked the power to render the particular judgment or sentence.' " *Id*. at 497 (quoting *People v. Rodriguez*, 355 Ill. App. 3d 290, 296 (2005)). "If a court lacks either subject matter jurisdiction over the matter or personal jurisdiction over the parties, any order entered in the matter is void *ab initio* and, thus, may be attacked at any time." *In re M.W.*, 232 Ill. 2d 408, 414 (2009). We review *de novo* the legal question of whether a trial court obtained personal jurisdiction. *In re Detention of Hardin*, 238 Ill. 2d 33, 39 (2010).

¶ 44                                          Diligent Inquiry

¶ 45    First we will address the father's claim that the State and DCFS failed to use diligent inquiry in order to effectuate service upon him. Section 2-16(2) of the Juvenile Court Act states the following about due diligence prior to resorting to service by publication:

"Where a respondent's usual place of abode is not known, a diligent inquiry shall be made to ascertain the respondent's current and last known address. The Department of Children and Family Services shall adopt rules defining the requirements for conducting a diligent search to locate parents of minors in the custody of the Department. If, after diligent inquiry made at any time within the preceding 12 months, the usual place of abode cannot be reasonably ascertained, or if respondent is concealing his or her whereabouts to avoid service of process, petitioner's attorney shall file an affidavit at the office of the clerk of court in which the action is pending showing that respondent on due inquiry cannot be found or is concealing his or her whereabouts so that process cannot be served. The affidavit shall state the last known address of the respondent. The affidavit shall also state what efforts were made to effectuate service." 705 ILCS 405/2-16(2) (West 2012).

"Thus, section 2-16(2) contemplates a trial court obtaining personal jurisdiction through service by publication *only* when the State has conducted a diligent inquiry to ascertain the respondent's location and last known address." (Emphasis in original.) *In re Dar. C.*, 2011 IL 111083, ¶ 64. "Although section 2-16(2) does not define what constitutes a diligent inquiry or search, the standard is recognized to be that kind of search or investigation which a diligent person, intent on ascertaining a fact, would usually and ordinarily make." (Internal quotation marks omitted.) *Id.* ¶ 65.

¶ 46    Here, Jamari was born in 2007 and the identity of his father was not discerned until April 2014. During that time, the mother gave sworn testimony on numerous occasions that she did not know the identity of the father, and the caseworkers assigned to Jamari's case over the years all testified that the mother never indicated that she knew the identity of the father. The caseworkers further testified that they frequently checked the Illinois Putative Father Registry and never found anything reported from the father.[2] In April 2014, when the mother identified the father in court, service upon the father was promptly obtained. Given that there is nothing in the record that would have allowed the State or DCFS to learn the identity of the father until April 2014— they had no information regarding the father's first or last name, no last known addresses, no social security checks to Jamari and, most importantly, sworn testimony from the mother that she did not know the identity of the father—we cannot find that the State and DCFS did not conduct a diligent inquiry based on the information they had. In this case, the State conducted a diligent inquiry in search of Jamari's father, memorialized that inquiry in an affidavit, requested notice by publication and, thus, fulfilled its duties under the Act. See *In re A.S.B.*, 293 Ill. App. 3d 836, 843 (1997). The fact that the mother later named the father does not mean the State was not diligent in its efforts. As such, based on the record before us, we disagree with the father's argument that the State and DCFS failed to use diligent inquiry in order to effectuate service on the father. See 705 ILCS 405/2-16(2) (West 2012).

¶ 47                    Sufficiency of Service by Publication

¶ 48    Next we address the father's argument that his service by publication in this matter was deficient. The father argues that notice by publication in this case was defective. The father argues that although the publication notice follows the format provided by statute, the last names

---

[2] The father concedes that he did not make any inquiry on the Putative Father Registry as to whether he had a son or daughter with the mother.

of Jamari and the mother are misspelled as "[Spelling 1]" when they should have been spelled "[Spelling 2]."

¶ 49    Once the State has filed the due diligence affidavit discussed above, the clerk of the court is directed to effectuate service by publication. Section 16-2(2) of the Act states:

"Notice by publication shall be substantially as follows:

'A, B, C, D, (here giving the names of the named respondents, if any) and to All Whom It May Concern (if there is any respondent under that designation):

Take notice that on (insert date) a petition was filed under the Juvenile Court Act of 1987[ ] by ... in the circuit court of ... county entitled 'In the interest of ..., a minor', and that in ... courtroom at ... on (insert date) at the hour of ..., or as soon thereafter as this cause may be heard, an adjudicatory hearing will be held upon the petition to have the child declared to be a ward of the court under that Act. THE COURT HAS AUTHORITY IN THIS PROCEEDING TO TAKE FROM YOU THE CUSTODY AND GUARDIANSHIP OF THE MINOR, TO TERMINATE YOUR PARENTAL RIGHTS, AND TO APPOINT A GUARDIAN WITH POWER TO CONSENT TO ADOPTION. YOU MAY LOSE ALL PARENTAL RIGHTS TO YOUR CHILD. IF THE PETITION REQUESTS THE TERMINATION OF YOUR PARENTAL RIGHTS AND THE APPOINTMENT OF A GUARDIAN WITH POWER TO CONSENT TO

ADOPTION, YOU MAY LOSE ALL PARENTAL RIGHTS TO

THE CHILD. Unless you appear you will not be entitled to further

written notices or publication notices of the proceedings in this

case, including the filing of an amended petition or a motion to

terminate parental rights.

Now, unless you appear at the hearing and show cause

against the petition, the allegations of the petition may stand

admitted as against you and each of you, and an order or judgment

entered.' " 705 ILCS 405/2-16(2) (West 2012).

¶ 50    Although there is evidence in the record that the mother used several aliases in the past, including the last name "[Spelling 1]," and there is no evidence in the record as to what name the father knew the mother by, we cannot ignore the fact that prior to publication, the State was repeatedly informed that the last name of Jamari and the mother was "[Spelling 2]" not "[Spelling 1]." As such, because the service by publication did not have the correct last name for both the minor and the mother, we find that service by publication in this matter was defective because it did not substantially comply with section 16-2 of the Juvenile Court Act and, therefore, did not confer the trial court with personal jurisdiction over the father. See 705 ILCS 405/2-16(2) (West 2012). We acknowledge the State's argument that the names, [Spelling 1] and [Spelling 2], are similar, and therefore, the notice is sufficient under the rule of *idem sonans*. See *People v. White*, 311 Ill. App. 3d 374, 382-83 (2000) (discussing the rule of *idem sonans*, which provides that the spelling of two names, if the correct pronunciation of the two names is practically identical, are held to designate the same person). However, the rule of *idem sonans* does not apply here because "[Spelling 1]" is not pronounced the same as "[Spelling 2]."

17

Therefore, the notice of publication was not sufficient to confer the trial court with personal jurisdiction over the father, and all orders entered in the case prior to the father's appearance are void. See *In re M.W.*, 232 Ill. 2d at 414.

¶ 51                                    Waiver of Service

¶ 52     While we have found that service by publication in this matter was defective because it did not contain the correct last name of the minor and the mother, the State and GAL argue that the father waived any argument relating to service when he appeared in the proceedings without making any objections to service or personal jurisdiction. In response, the father argues that his appearance in this matter could only waive prospective objections relating to proper service and personal jurisdiction over him; it could not retroactively waive those objections and validate orders entered prior to his appearance. For the reasons that follow, we find that the father's appearance in the matter resulted only in prospective waiver of service and personal jurisdiction over him.

¶ 53     Section 2-15(7) of the Juvenile Court Act provides that service of a summons may be waived as follows:

> "(7) The appearance of the minor's legal guardian or custodian, or a person named as a respondent in a petition, in any proceeding under this Act shall constitute a waiver of service of summons and submission to the jurisdiction of the court, except that the filing of a motion authorized under Section 2-301 of the Code of Civil Procedure [(Code)] does not constitute an appearance under this subsection. A copy of the summons and

petition shall be provided to the person at the time of his appearance." 705 ILCS 405/2-15(7) (West 2012).

Section 2-301 of the Code, referenced in section 2-15(7) of the Juvenile Court Act, states in relevant part:

"Objections to jurisdiction over the person.

(a) Prior to the filing of any other pleading or motion other than a motion for an extension of time to answer or otherwise appear, a party may object to the court's jurisdiction over the party's person, either on the ground that the party is not amenable to process of a court of this State or on the ground of insufficiency of process or insufficiency of service of process, by filing a motion to dismiss the entire proceeding or any cause of action involved in the proceeding or by filing a motion to quash service of process. ***

(a-5) If the objecting party files a responsive pleading or a motion (other than a motion for an extension of time to answer or otherwise appear) prior to the filing of a motion in compliance with subsection (a), that party waives all objections to the court's jurisdiction over the party's person." 735 ILCS 5/2-301(a), (a-5) (West 2012).

The father concedes that he never filed a motion pursuant to section 2-301 of the Code. However, the father argues that his appearance only waives the issue of service and personal jurisdiction *prospectively*, not retroactively. As a result, the father argues that his appearance

cannot validate orders that were improperly entered before his appearance in the matter. In making this argument, the father relies on *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311. In *Mitchell*, after entry of a default judgment of foreclosure and order of sale, the defendant filed an appearance and motion to vacate the order of sale. *Mitchell*, 2014 IL 116311, ¶¶ 6-8. The defendant later filed a motion to quash service and to vacate the order confirming the sale, which was denied by the trial court. *Id.* On appeal, the defendant challenged substitute service of process (also known as abode service), and the plaintiff acknowledged that the method of service was improper; however, the appellate court found the defendant waived any challenge based on personal jurisdictional by not raising the jurisdictional argument prior to filing an appearance and motion to vacate the order of sale. *Id.* ¶¶ 12-14.

¶ 54 On appeal, the supreme court discussed the effect of the 2000 amendment to section 2-301(a-5) of the Code on whether the filing of a responsive pleading confers personal jurisdiction only prospectively or whether it operates to confer personal jurisdiction retroactively so as to validate earlier orders. *Id.* ¶¶ 32-43. The supreme court ultimately found that the filing of the defendant's postjudgment motion to vacate the order confirming the sale "waived objections to the circuit court's personal jurisdiction prospectively only, however. The waiver did not serve to validate retroactively the void orders entered prior to defendant's submission to the court's jurisdiction." *Id.* ¶ 44. The court's ruling was based on its interpretation of the language in section 2-301 of the Code and finding that there was nothing in the language of that section of the Code to show that the legislature intended to alter the longstanding rule that one who submits to the court's jurisdiction does so prospectively only.

> "Based on the statutory language and legislative history, we
> do not believe the legislature intended to adopt a rule allowing a

defendant's waiver to validate retroactively orders entered without personal jurisdiction. Plaintiff's proposed construction of the statute is at odds with the fundamental rationale of our rule providing for prospective-only submission to the court's jurisdiction, namely, to avoid 'depriv[ing] the defendant of his day in court.' (Internal quotation marks omitted.) *J.C. Penney Co.*, 114 Ill. App. 3d at 647. In the absence of clear language or legislative history to the contrary, we conclude section 2-301(a-5), as amended, codified the law on waiver as it existed before the amendment. We, therefore, reaffirm the longstanding rule that 'a party who submits to the court's jurisdiction does so only prospectively and the appearance does not retroactively validate orders entered prior to that date.' *Verdung*, 126 Ill. 2d at 547."

*Mitchell*, 2014 IL 116311, ¶ 43.

The court further noted that "where a judgment is void when entered, it remains void despite subsequent submission by a party to the circuit court's jurisdiction." (Internal quotation marks omitted.) *Id.* ¶ 27. As such, in *Mitchell*, our supreme court reinforced the longstanding rule that when a party submits to the court's jurisdiction, it does so "only prospectively and the appearance does not retroactively validate orders entered prior to that date." (Internal quotation marks omitted.) *Id.* ¶ 43; *In re M.W.*, 232 Ill. 2d at 428-29 ("in a proceeding under the Juvenile Court Act, once personal jurisdiction over a parent is obtained, that jurisdiction continues until the matter is resolved"). As applied in this case, the father's appearance did not retroactively validate the orders issued by the trial court prior to his appearance, which were entered without

personal jurisdiction over him. As such, those orders are void. *In re M.W.*, 232 Ill. 2d at 414 ("If a court lacks either subject matter jurisdiction over the matter or personal jurisdiction over the parties, any order entered in the matter is void *ab initio* and, thus, may be attacked at any time.").

¶ 55    It is well-settled that this court must follow the law as declared by our supreme court. *Ausman v. Arthur Andersen, LLP*, 348 Ill. App. 3d 781, 787 (2004); see *Illinois Labor Relations Board v. Chicago Transit Authority*, 341 Ill. App. 3d 751, 758 (2003) ("After the supreme court has declared the law with respect to an issue, [the appellate] court must follow that law because only the supreme court has authority to overrule or modify its decisions."). The State and GAL argue that the rule reinforced by the supreme court in *Mitchell* should not apply here because *Mitchell* was not a proceeding under the Juvenile Court Act. We recognize that the "overriding purpose of the Act to which all other goals are subordinate is the best interest of the child involved" (internal quotation marks omitted) (*In re Austin W.*, 214 Ill. 2d 31, 50-51 (2005)), and, in this case, Jamari's caseworkers gave opinions that it would be in Jamari's best interest to terminate parental rights. However, our courts have determined that a parent in the juvenile court case has the same due process rights to service as individuals in any civil or criminal case. *In re C.R.H.*, 163 Ill. 2d 263, 269 (1994) (a minor and his or her parents have a constitutional right of due process to receive adequate notice of a juvenile proceeding). Furthermore, the State and GAL have not provided us with persuasive authority as to why the rule as laid out in the supreme court's ruling in *Mitchell*—that a party's appearance results in prospective waiver of service and personal jurisdiction only—should be limited to that case and not applied in Juvenile Court Act proceedings. Therefore, where the trial court conducted the adjudicatory and dispositional hearings, which are a predicate to a termination of parental rights hearing, without having personal jurisdiction over the father, we will follow our supreme court's precedent and find those

orders are void. The father's appearance in this matter resulted in a prospective waiver of service only that did not validate the orders previously entered by the court without personal jurisdiction over the father. See *Mitchell*, 2014 IL 116311, ¶ 43.

¶ 56    The GAL argues that we should follow the court's ruling in *In re Antwan L.*, 368 Ill. App. 3d 1119 (2006), where the father's appearance at the termination hearing was construed as a retroactive waiver. However, *Antwan* was decided several years before the supreme court's ruling in *Mitchell*, and the court in *Antwan* was not presented with the argument that we are squarely asked to decide here—whether a party's appearance in legal proceedings results in a prospective waiver of service and personal jurisdiction only or whether it also results in a retroactive waiver of service and personal jurisdiction. As such, because *Antwan* was decided before the supreme court's decision in *Mitchell* and did not address the issue we have been asked to decide here regarding prospective and/or retroactive waiver of service by appearance, we find *Antwan* is not controlling. Therefore, the orders entered prior to the father's appearance, which were entered without personal jurisdiction over the father due to defective service by publication, are void. *In re M.W.*, 232 Ill. 2d at 414 ("If a court lacks either subject matter jurisdiction over the matter or personal jurisdiction over the parties, any order entered in the matter is void *initio* and, thus, may be attacked at any time.").

¶ 57                                          CONCLUSION

¶ 58    For the reasons above, we reverse the trial court's order terminating the father's parental rights and remand this matter for further proceedings consistent with this order.

¶ 59    Reversed and remanded.