NOTICE
Decision filed 02/16/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220437-U

NOS. 5-22-0437, 5-22-0438, 5-22-0636 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* M.F., M.S., and L.F., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Fayette County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 19-JA-13, 19-JA-14, |
| v. | ) | 19-JA-16 |
| | ) | |
| B.F., | ) | Honorable |
| | ) | Allan F. Lolie Jr., |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's decision to terminate Mother's parental rights based on its findings that Mother was an unfit parent and based upon the best interests of the children was not against the manifest weight of the evidence.

¶ 2    Respondent, B.F. (Mother), appeals the judgment of the circuit court of Fayette County terminating her parental rights to her minor children, M.F., M.S., and L.F. Mother claims the trial court's fitness determination and best interest findings were in error. For the following reasons, we affirm.

1

¶ 3    We note that this appeal was accelerated pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to that rule, the appellate court must, except for good cause shown, issue its decision within 150 days from the filing of the notice of appeal. Ill. S. Ct. R. 311(a)(5) This decision was issued more than 150 days after the filing of the notice of appeal, for good cause, as the briefing schedule was amended pursuant to an unopposed request by the respondent for an extension of time.

¶ 4                              I. BACKGROUND

¶ 5    Mother is the biological mother of M.F., born July 13, 2005, M.S., born May 24, 2006, and L.F., born September 9, 2009. R.S. is the biological father of the three children and he is not a party to this appeal.

¶ 6    Mother has a history of abusing heroin, pills, methamphetamines, and marijuana. In late February or early March of 2019, Mother left her children with a relative and sought substance abuse treatment in a facility in Chicago, Illinois. Mother, without completing treatment, discharged herself from the facility a week after her arrival. She did not return for her children. On May 7, 2019, the Department of Children and Family Services (DCFS) became involved because the temporary caregiver did not have legal authority to assist the children with medical treatment and could no longer provide care.

¶ 7    On May 16, 2019, the State filed juvenile petitions for each of the children alleging that they were neglected based on being in an environment injurious to their welfare, pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)). The State's petition averred that Mother left her children with a relative and

2

failed to return. The State additionally claimed that Mother was reportedly homeless; she had a warrant for her arrest; and Mother had recently used methamphetamines.

¶ 8 The shelter care hearing was held after the juvenile petitions were filed. Mother did not appear, and the State requested that the trial court enter a default judgment. The State argued that the temporary caregiver had no legal authority to care for the children, making an award of temporary custody necessary. The trial court found that there was an immediate and urgent necessity, and it was in the best interests of the children to grant shelter care. DCFS was awarded temporary custody and guardianship.

¶ 9 During the adjudicatory hearing, Mother stipulated to the allegations in the juvenile petitions. The court found that the children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2018)) because Mother's conduct created an environment injurious to the children's welfare. The trial court entered the written orders of adjudication on August 15, 2019.

¶ 10 On September 12, 2019, Lutheran Child and Family Services (LCFS) filed a dispositional hearing report which included Mother's progress on her service plan. Mother was required to complete substance abuse, mental health, and domestic violence assessments, and comply with any recommended services identified by those assessments. Mother was additionally required to complete parenting classes and maintain contact with LCFS. Mother had not completed any of the recommended assessments, she had not completed parenting classes, and she was not maintaining contact with her caseworker.

¶ 11 That same day, the trial court held the dispositional hearing. Mother did not appear and was found to be in default. Custody and guardianship were placed with the DCFS

Guardianship Administrator with authority to consent to required medical and dental treatment. The permanency goal was for the children to return home in 12 months.

¶ 12 On July 9, 2020, LCFS filed a report that stated Mother had not completed any services on her service plan. She had not taken a substance abuse assessment and had recently tested positive for methamphetamines. Mother had maintained contact with her caseworker and participated in visitation until she was arrested on February 26, 2020. Mother was released in March of 2020. A diligent search was performed on April 7, 2020. The caseworker believed Mother was living near Vandalia, Illinois. Mother contacted the caseworker in June of 2020, and Mother then entered into a rehabilitation program for substance abuse.

¶ 13 On August 13, 2020, the case was set for a permanency review hearing. Mother informed the court that she was "currently in a program," had a job interview, and she was "doing a lot better now." The hearing was continued because the parties had not received a report from LCFS.

¶ 14 By September 10, 2020, Mother had moved to Springfield, Illinois, without successfully completing the rehabilitation program. She failed to provide verification of her new address to her caseworker. During a permanency review hearing, her attorney requested an additional continuance to review the LCFS report with Mother. The trial court granted the continuance. Mother provided her phone number and an address in Springfield, Illinois, during the hearing.

¶ 15 On October 8, 2020, a permanency hearing was held. The State had requested to modify the permanency goal to substitute care pending court determination of termination

4

of parental rights. Mother informed the court that she was sober and intended to move back to Fayette County. She was searching for housing and employment, and she stated that she was "begging my DCFS worker to help me, and I get nothing." The court entered an order with a permanency goal of substitute care pending court determination of termination of parental rights. The court admonished Mother that she was required to cooperate with DCFS, comply with her service plan, and correct the conditions that brought the children into care or risk termination of her parental rights.

¶ 16 During a hearing on June 17, 2021, Mother's attorney reported to the court that Mother was in the Fayette County jail. Mother had four pending felony charges. Mother's caseworker informed the court that Mother had not had visitation with her children since October of 2020. The caseworker reported multiple failed attempts to find Mother and arrange visits with her children before Mother went to jail. Mother's caseworker agreed to visit Mother while she was in custody.

¶ 17 The State filed petitions to terminate Mother's parental rights on June 23, 2021. The State alleged that Mother should be found unfit based on multiple grounds as outlined in the Illinois Adoption Act (750 ILCS 50/1(D) (West 2020)). Specifically, the State claimed that Mother abandoned the children (750 ILCS 50/1(D)(a) (West 2020)); Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2020)); Mother had deserted the children (750 ILCS 50/1(D)(c) (West 2020)); Mother failed to make reasonable efforts to correct the conditions that were the basis for removing the children (750 ILCS 50/1(D)(m)(i) (West 2020)); and Mother failed to make reasonable progress toward the return of the minors within nine

5

months following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)). The petition did not include a date specific nine-month period.

¶ 18    On December 2, 2021, the court held a fitness hearing. The State called three caseworkers from LCFS as witnesses. Jessica Holt was Mother's caseworker from December of 2019 through November of 2020. April Hosein-Reid was Mother's caseworker from November 2020 until October 2021. Jacquelyn Jones was Mother's caseworker from October 2021 through the hearing date.

¶ 19    Holt testified that Mother had not corrected the situation that brought the children into care. According to Holt, Mother was required to complete parenting services, a mental health assessment, a drug abuse assessment, follow all recommendations from the assessments, and obtain employment and stable housing. Mother completed two of the assessments but did not follow any recommendations to successfully complete services. Mother was incarcerated for drug-related crimes for a portion of the time while Holt was the caseworker. When Mother was not incarcerated, she participated in supervised visitation.

¶ 20    Hosein-Reid testified that when she became Mother's caseworker, Mother had "a continuing service plan from the initial service plan." Mother had not satisfied any services. Hosein-Reid was unaware whether Mother's service plan included parenting classes. Mother had possibly completed parenting classes before Hosein-Reid was assigned as her caseworker.

¶ 21    Mother was incarcerated when Hosein-Reid took over as caseworker and Mother could not be located after her release. Hosein-Reid performed multiple diligent searches in

6

multiple counties to find Mother. Mother was located in Fayette County and she was taken into custody before Hosein-Reid met with Mother. Hosein-Reid testified that Covid-19 issues initially prevented her from visiting Mother. Then, Hosein-Reid transferred positions. She never met with Mother in person while she was in the Fayette County jail. Mother never called, sent letters, or emailed LCFS while Hosein-Reid was Mother's caseworker.

¶ 22    Jacquelyn Jones testified that she was on sick leave shortly after she became Mother's caseworker. When Jones was unavailable, no one from LCFS received any phone calls or other contact from Mother. The last contact that Mother had with the agency about the service plan was in June or July of 2021. Jones testified that Mother had not made satisfactory progress on her service plan.

¶ 23    The State rested after Jones testified. Mother did not present any witnesses. After closing arguments were presented, the trial court then took the matter under advisement.

¶ 24    On December 7, 2021, the trial court entered a written order regarding the fitness determination. The court considered the testimony by the three caseworkers. Holt had testified about Mother's service plan requirements. Mother completed assessments but failed to follow through with any recommended treatments. Hosein-Reid and Jones had never met with Mother because Mother's whereabouts were either unknown or Mother was incarcerated. No progress had been made by Mother on her service plan according to Hosein-Reid and Jones. Mother did not present evidence at the hearing to rebut the State's evidence. The trial court noted that, "[t]ypically, the court would expect the State to present the various client service plans and address each goal regarding each parent, however, in

7

this case, it is clear that neither parent cooperated with LCFS in any way." The trial court determined that the State had proven that Mother was unfit pursuant to sections 1(D)(a), (b), (c), (m)(i), and (m)(ii) of the Adoption Act (750 ILCS 50/1(D)(a), (b), (c), (m)(i), (m)(ii) (West 2020)) for all three children.

¶ 25 The best interest hearing was held on April 14, 2022. Tiana Shear, a program supervisor with LCFS, testified first. The children had been placed in three separate traditional foster homes because no family members were available to care for the children. The children attended school in three different school districts and had not seen each other in months. The oldest child, M.F., refused to see her siblings and she wished to be adopted. The other two children did not want to return to their parents. Each of the foster parents had expressed to LCFS that they wished to adopt the child in their care.

¶ 26 According to Shear, the children were "safe and happy" in their foster homes. The children had behavioral issues and were receiving counseling services. M.F. was having trouble in school. An individualized education plan (IEP) to address M.F.'s needs was being developed. M.S. was having issues with being disrespectful to her foster parents. L.F. was doing well in school.

¶ 27 M.F.'s foster mother testified that she was willing to adopt M.F. She loved her. M.F.'s foster mother testified that she wanted to provide M.F. with stability and a family. She was also financially able to care for M.F. The foster mother had a 12-year-old daughter, who M.F. considered as a little sister. M.F. participated in reading, math, and art programs outside of school. She additionally frequented the YMCA to play basketball.

8

¶ 28 M.S.'s foster mother testified that she loved M.S. and wished to adopt her. When M.S. moved in with her foster family, she was "very out of control." Her foster mother testified that she had addressed M.S.'s needs and was able to care for her. She could provide M.S. with a sense of permanence. The foster mother also believed that she could financially take care of M.S. She was the foster mother to four children, including M.S.'s half-sister, and she had a 14-year-old son. The children got along with each other, most of the time. M.S. and her foster family were involved with the church.

¶ 29 L.F.'s foster mother testified that she loved L.F., was willing to adopt her, and she was financially able to support her. She testified that she was able to provide L.F. with a sense of familiarity and had a safe home. L.F.'s foster mother has an eight-year-old daughter that considers L.F. to be her big sister. L.F. was doing well at school and was involved in track, volleyball, and cheerleading. The State did not present further witnesses.

¶ 30 Mother testified on her own behalf to the attempts she made to contact her children. She last spoke to M.F. on September 5, 2019. Mother called M.S. last year on her birthday. She spoke to L.F. last year on the phone and she had written L.F. a letter. Mother testified that she did not know her caseworkers. One of the caseworkers told Mother that she was going to meet with her, but never did. Mother admitted that she had not attempted to complete any service plan tasks. Mother also testified that it was best for her children to remain where they are placed for right now.

¶ 31 Mother additionally testified that she pled guilty in her criminal case days before the best interest hearing. She received an eight-year sentence with the Department of

Corrections. Mother believed that she would serve three years since she received day-for-day credit and she had received credit for time served.

¶ 32    The State then argued that it was in the best interest of the children to remain in their foster homes. The children were in stable, loving, and caring homes. The foster parents were addressing the children's financial, spiritual, mental, and physical needs. Each foster family wished to proceed with adoption.

¶ 33    Mother argued that since she would still be incarcerated when M.F. turned 18, it was in M.F.'s best interest to be adopted. Mother requested that the other children stay in their current placements under a guardianship. She further requested that the trial court review her case upon her release from the Department of Corrections and make a best interest determination at that time.

¶ 34    The guardian *ad litem* (GAL) believed that the foster parents had done a remarkable job. The GAL further believed that the State had met its burden of proving by a preponderance of the evidence that it was in the best interests of the children to terminate Mother's parental rights. The trial court took the matter under advisement.

¶ 35    On April 19, 2022, the trial court entered an order regarding the best interests of the children. The order acknowledged that it was obligated to assess the best interest of each child according to the statutory factors required by section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)). The trial court outlined the statutory factors and applied those factors to the evidence presented for each child. The trial court found that it was in the best interest of each child to terminate Mother's parental rights.

10

¶ 36    After the trial court's decision was issued, Mother submitted a letter to the trial court and requested another chance to complete the reunification program. Mother, through her attorney, filed a motion to reconsider the trial court's decision to terminate Mother's parental rights. On June 30, 2022, the court held the motion to reconsider hearing and denied Mother's request. This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, Mother claims that the trial court erred in finding her unfit under multiple grounds. Mother additionally claims that the trial court's best interest finding was against the manifest weight of the evidence.

¶ 39    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). Section 2-29 of the Juvenile Court Act provides a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). First, the trial court must find that the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) based on clear and convincing evidence. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). After the court makes a finding of unfitness, the trial court then determines whether the State has proven that it is in the child's best interest to terminate parental rights by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366 (2004).

¶ 40                              A. Fitness Determination

¶ 41    A determination of unfitness involves factual findings and credibility assessments, and the trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). A determination is

11

against the manifest weight of the evidence if the opposite conclusion is clearly evident. *In re Gwynne P*., 215 Ill. 2d 340, 354 (2005).

¶ 42 The trial court concluded that the State had proven that Mother was unfit based on multiple grounds including Mother abandoned the children (750 ILCS 50/1(D)(a) (West 2020)); Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to her children's welfare (750 ILCS 50/1(D)(b) (West 2020)); Mother had deserted the children (750 ILCS 50/1(D)(c) (West 2020)); Mother failed to make reasonable efforts to correct the conditions that were the basis for removing the children (750 ILCS 50/1(D)(m)(i) (West 2020)); and Mother failed to make reasonable progress toward the return of the children within nine months following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 43 Mother challenges the trial court's determination of fitness on all five grounds. The State, however, focused its argument on appeal on three of the five grounds. See 750 ILCS 50/1(D)(b), (m)(i), (m)(ii) (West 2020). The trial court's finding may be affirmed where evidence supports a finding of unfitness on any of the grounds alleged by the State. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). As such, we will begin our review with the grounds addressed by the State.

¶ 44 "Reasonable efforts" relate to correcting the conditions that led to the removal of the children and are judged by a subjective standard based upon the effort that is reasonable for a particular person involved. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. The court must determine whether the parent made earnest and conscientious strides toward

correcting the conditions that led to the removal of the children. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 45    "Reasonable progress" is an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). Progress is measured by the parent's compliance with the court's directives, services plans, or both and requires the parent to make measurable or demonstrable movement toward the reunification goal in the near future. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006).

¶ 46    "In determining whether a parent showed reasonable concern, interest or responsibility as to a child's welfare, we have to examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990). Fitness is determined by Mother's effort to communicate or show interest in her children. *In re A.S.B.*, 293 Ill. App. 3d 836, 843 (1997). In evaluating Mother's conduct, the trial court must focus on the reasonableness of her efforts and not on her success. *In re E.O.*, 311 Ill. App. 3d 720, 727 (2000). The trial court may consider evidence regarding the completion of the service plan when determining whether Mother had demonstrated interest, concern, or responsibility. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 35.

¶ 47    Mother raises issue with the State's petition to terminate parental rights because the State had not identified a specific nine-month period where Mother failed to make reasonable progress. The grounds for unfitness include a parent's failure to make reasonable efforts and reasonable progress during any nine-month period after adjudication. 750 ILCS 50/1(D)(m)(ii) (West 2020). Section 1(D)(m) requires the State to

13

file a pleading that specifies the nine-month period or periods it relied on in its petition to terminate parental rights. 750 ILCS 50/1(D)(m)(ii) (West 2020). The failure of the State to file and serve such notice is a pleading defect. *In re S.L.*, 2014 IL 115424, ¶ 27. Mother forfeited review of this issue because she failed to object to the State's petition or request specific dates to be provided by the State when she was before the trial court. *In re Kenneth J.*, 352 Ill. App. 3d 967, 974 (2004).

¶ 48 The parties proceeded at trial as if all possible nine-month periods were relevant. We consider any nine-month period after the written order of adjudication was entered on August 15, 2019, when determining whether Mother made reasonable efforts or reasonable progress. We additionally note that "time spent in prison does not toll the nine-month period." *In re J.L.*, 236 Ill. 2d 329, 341 (2010).

¶ 49 The children were brought into care due to issues stemming from Mother's drug use as Mother failed to return for her children after an unsuccessful attempt to receive substance abuse treatment. A service plan was created for Mother to establish action steps to correct the conditions that led to the removal of her children. Mother was required to secure housing and employment, complete a substance abuse assessment, a mental health assessment, a domestic violence assessment, and complete parenting classes. LCFS filed multiple reports with the court summarizing Mother's progress with her service plan.

¶ 50 Mother argues that two of her caseworkers, Hosein-Reid and Jones, failed to contact her regarding her updated service plan which prevented her from making reasonable efforts. During the first nine months after adjudication, from August 16, 2019, through May 16, 2020, Holt was Mother's caseworker. Holt testified that Mother completed the

two required assessments but did not follow any recommendations to successfully complete services. Mother was incarcerated for drug-related crimes for a portion of the time while Holt was the caseworker. Holt remained as caseworker for several months after the initial nine-month period after adjudication.

¶ 51    Hosein-Reid testified that she was unable to meet with Mother in person to review the service plan. When Hosein-Reid was assigned as Mother's caseworker in November of 2020, Mother's whereabouts were unknown. Hosein-Reid completed several unsuccessful diligent searches in an attempt to locate Mother. After Mother was located in the Fayette County jail, Covid-19 prevented Hosein-Reid from visiting. Hosein-Reid then transferred positions. Hosein-Reid testified that Mother failed to call, email, or send a letter to LCFS while she was Mother's caseworker.

¶ 52    Jones became Mother's caseworker a couple months prior to the fitness hearing and never met with Mother. Mother did not contact LCFS after Jones was assigned as caseworker. All three caseworkers provided testimony that Mother was rated unsatisfactory on her service plan and Mother did not present any evidence at the fitness hearing. Sufficient evidence was presented for the trial court to determine that Mother was unfit for failing to make reasonable efforts to correct the conditions that led to the removal of the children.

¶ 53    Mother additionally argues that the State could not demonstrate that she failed to make reasonable progress where she was not provided with updated service plans or services. The updated service plans were a continuation of the initial plan. After August 15, 2019, Mother had only completed two assessments and never followed through with

services that were required on the initial plan. Mother additionally failed to secure housing and employment. Objectively, reasonable progress had not been made during the nine months following the adjudication of neglect because, as of the date of the fitness hearing, the children could not be returned to Mother in the near future. The trial court's determination that Mother was unfit for her lack of reasonable progress was not against the manifest weight of the evidence.

¶ 54 Mother spent a significant amount of time in custody throughout the case. When she was not incarcerated, Mother failed to contact LCFS, failed to contact her children, and failed to comply with her service plan. The last time Mother had visitation with her children was in October of 2020, over a year prior to the fitness hearing. The trial court's determination that Mother was unfit for failing to demonstrate interest, concern, or responsibility for her children's welfare was not against the manifest weight of the evidence.

¶ 55 Having held that Mother was unfit, we do not need to address whether she was unfit under section 1(D)(a) for abandoning her children or under section 1(D)(c) for deserting the children. See *In re C.W.*, 199 Ill. 2d at 217.

¶ 56                                B. Best Interest Determination

¶ 57 After the court determines whether a parent is unfit and their rights can be terminated, the focus shifts to the child's best interest and whether parental rights should be terminated. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court's best interest determination will

not be disturbed unless it is contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 1001 (2004).

¶ 58    In making a best interest determination, section 1-3(4.05) of the Juvenile Court Act requires a trial court to consider a number of statutory factors. 705 ILCS 405/1-3(4.05) (West 2020). "Additionally, a court may consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being." *In re Jaron Z.*, 348 Ill. App. 3d 239, 262 (2004).

¶ 59    Shear testified that the children felt safe and happy in their foster homes. The children had bonded with the other children in the households. Each foster parent testified that they loved their foster child and wished to adopt. Additionally, each foster parent had the financial ability to care for the child in their care. M.F. wished to be adopted and the other two children did not want to return to their parents.

¶ 60    M.F. and M.S. had exhibited some behavioral issues, but their foster parents were addressing their needs and the children were improving. M.F.'s foster mother was addressing her educational issues, including moving forward with the IEP process. L.F. was excelling in school and with her extracurricular activities.

¶ 61    Sufficient evidence was presented for the trial court to make its best interest determination with regard to each child. Accordingly, we find that the trial court's determination that it was in the children's best interest to terminate Mother's parental rights was not against the manifest weight of the evidence.

17

¶ 62                            III. CONCLUSION

¶ 63    For the foregoing reasons, we affirm the judgment of the circuit court of Fayette

County.

¶ 64    Affirmed.