NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240737-U

NO. 4-24-0737

IN THE APPELLATE COURT

FILED
August 27, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* C.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McDonough County |
| Petitioner-Appellee, | ) | No. 21JA33 |
| v. | ) | |
| Sonny S., | ) | Honorable |
| Respondent-Appellant). | ) | Heidi A. Benson, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Steigmann and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed the trial court's judgment terminating respondent's
parental rights, concluding the unfitness and best-interest findings were not against
the manifest weight of the evidence.

¶ 2    In October 2023, the State filed a petition to terminate the parental rights of

respondent, Sonny S., to his minor child, C.S. (born in October 2017). The trial court found

respondent unfit and determined it was in C.S.'s best interest to terminate his parental rights.

Respondent appeals, arguing the court's unfitness and best-interest findings were against the

manifest weight of the evidence. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                    A. The Wardship Petition and Adjudication of Neglect

¶ 5    On September 27, 2021, the State filed a petition seeking to adjudicate C.S.

neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b)

(West 2020)). The State alleged C.S. was neglected for being in an environment injurious to her welfare in that her mother, Samantha M., tested positive for amphetamine and methamphetamine four days earlier while acting as C.S.'s sole caretaker and had a history of methamphetamine use which negatively impacted her ability to properly care for C.S. Respondent was identified as C.S.'s "putative father" in the neglect petition and his address was "[u]nknown after diligent search." Following a shelter care hearing the same day, the trial court entered an order granting temporary guardianship and custody of C.S. to the Illinois Department of Children and Family Services (DCFS). The order stated respondent had not received notice of, and was not present for, the hearing. Following the October 2021 adjudicatory hearing, the court found C.S. neglected as alleged in the State's petition. The adjudicatory order stated respondent "[had] not been served with summons but service [was] not required because: [his] current whereabouts *** are unknown/unconfirmed."

¶ 6                    B. Service on Respondent by Publication

¶ 7            The day after the adjudicatory hearing, the State filed an "Affidavit for Service by Publication" in advance of the December 2021 dispositional hearing. The State averred respondent's address or whereabouts were unknown and "[r]easonable efforts have been made by the State's Attorney's Office and [DCFS] to identify and locate [respondent]." On November 1, 2021, an affidavit was filed with the McDonough County circuit clerk confirming publication was accomplished in the McDonough County Voice on October 27, 2021.

¶ 8                    C. The Dispositional Hearing

¶ 9            The dispositional hearing was not held until January 2022. The trial court found respondent unfit for reasons other than financial circumstances alone to care for C.S., specifically

due to his "fail[ure] to appear or participate." C.S. was made a ward of the court with her guardianship and custody to continue with DCFS.

¶ 10                              D. The Termination Proceedings

¶ 11                              1. *The Termination Petition*

¶ 12        In October 2023, the State filed a petition to terminate respondent's parental rights to C.S. The State alleged respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to C.S.'s welfare (750 ILCS 50/1(D)(b) (West 2022)). Specifically, the State alleged respondent "has failed to participate in any way in this matter and has not responded to attempts by social service agencies to contact [him] via diligent search results."

¶ 13                              2. *The Final Pretrial Conference*

¶ 14        The trial court held a final pretrial conference on the State's termination petition on February 15, 2024. Respondent appeared, for the first time in the case, by Zoom. The court explained C.S. was in foster care and the State filed a petition to terminate respondent's parental rights after he had not participated in the case. Respondent then addressed the court:

> "Your Honor, can I ask a quick question? Shouldn't I have been notified, basically, in the beginning? I have had no communication. ***
>
> You know, no one contacted me about any of this. If somebody had, I would have—as soon as I was notified, I was—I contacted DCFS, and they directed me to Lutheran Social Services is where I've been in contact with [Latesha] Lee. And, you know,

what I'm trying to ask is shouldn't somebody have from some type

of court, a letter, a phone call or something, you know."

¶ 15    After the trial court explained service by publication was arranged because his whereabouts were unknown, respondent continued:

"If my location is unknown, then, you know, I get letters for

child support. I've been on child support since [C.S.] was born. I've

never disputed it. I didn't want to make her life hard. *** And, yeah,

I lost contact but I never forgot about my daughter. I can give her a

very good life."

¶ 16                              3. *The Fitness Hearing*

¶ 17    The trial court held the fitness hearing on March 14, 2024. At the beginning of the hearing, respondent's counsel requested a 60-day continuance to allow respondent to continue services since he "just [came] into this case." Noting this was a "three-year-old case," the court denied the request for a continuance.

¶ 18                              a. Latesha Lee

¶ 19    Lutheran Social Services of Illinois caseworker Latesha Lee testified she had been assigned to C.S.'s case since July 2023. Lee reviewed the files assembled by previous caseworkers and spoke with C.S.'s foster parents. In her review of the files, Lee did not find any indication respondent was participating in any services or engaging in visitation or communication with C.S between September 1, 2022, and June 1, 2023. (This was the nine-month postadjudication period pertaining to the State's allegation of Samantha's unfitness. Samantha signed a surrender of her parental rights prior to the commencement of the hearing and is not a party to this appeal.) Respondent had no involvement in the case until first making

contact with Lee in February 2024. Since that initial contact, respondent has been "compliant and cooperative." Respondent expressed concern and a sense of responsibility for C.S., and they had one visit by that point.

¶ 20                                          b. Respondent

¶ 21        Respondent testified he and Samantha "were doing the coparenting thing" after C.S. was born and until some point in 2020, but Samantha "became extremely toxic," such that this arrangement became "impossible." Respondent explained, "I was never trying to stay away from my daughter. [Samantha] would not let me see her." Respondent stated he had no knowledge of the case from the time it was initiated until February 2024. (Samantha never told respondent about the case.) Respondent communicated with Samantha during that period to arrange visitation with C.S., but Samantha's responses were always "toxic and disgusting." Respondent explained:

> "It was just not—there was no kosher ground. There was no common ground with [Samantha.] She's an evil person. You know, the reason why I didn't try to seek no attorney or anybody from back home is because I needed people from out here who knew what I was dealing with. This wasn't a regular person. She was a really bad person to me."

¶ 22        Respondent testified he first learned C.S. was in foster care when he noticed one of the documents he received in connection with a preexisting child support case said "foster care" on it rather than Samantha's name. (This document, dated February 13, 2024, was admitted into evidence.) At that point, respondent "knew something was wrong, so it made [him] look into social services." Respondent contacted DCFS and obtained Lee's contact information.

Respondent had since begun engaging in services and had a visit with C.S. the day before the hearing. This visit was respondent's first time seeing or having contact with C.S. since 2020.

¶ 23 On cross-examination, respondent was asked if he felt concerned about C.S. given the issues he had in his relationship with Samantha. Respondent answered:

> "Of course, but [C.S. is] a baby girl and I didn't have much to offer them. So I was doing my best to make some type of communication with Samantha, but, you know, in my mind, I thought a little girl should be with her mother. Granted, [Samantha] was an animal to me, but I didn't have much to offer a little baby girl, you know.
>
> * * *
>
> [C.S.] was better with her mother in my eyes, I thought."

¶ 24 Respondent was asked if he considered hiring an attorney to assist with establishing visitation. Respondent said no, because he "didn't want to make [C.S.'s] life messy or hard" and "didn't want to drag her through a custody battle with her mother." Respondent also did not contact "any state agency or anyone who could help [him] locate where [his] daughter was" at any point between 2020 and February 2024, when he first contacted Lee.

¶ 25 c. The Trial Court's Unfitness Finding

¶ 26 The trial court found the State proved by clear and convincing evidence respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to C.S.'s welfare. The court noted respondent had no contact with C.S. from the time she came into care in September 2021 until February 2024. The court acknowledged respondent testified about making efforts to contact C.S., but it noted "his repeated assertion that

- 6 -

he made efforts lacks any modicum of specificity" as to when he made these efforts and whom exactly he contacted. Despite referring to Samantha as "a terrible, horrible, toxic person," respondent nonetheless felt C.S. was better off with her. Additionally, respondent "did not seek legal help because he was concerned that the representation would not understand what a terrible person [Samantha] was." The court also discussed the document which respondent explained was how he learned for the first time C.S. was in foster care. The court noted this document reflected what respondent paid for child support in 2023 and reflected C.S. was in foster care that year. Thus, the court "believe[d] that [respondent] did receive notice at least this way that [C.S.] was in foster care" before February 2024.

¶ 27                     4. *The Best-Interest Hearing*

¶ 28          The trial court held the best-interest hearing on May 2, 2024.

¶ 29                     a. Latesha Lee

¶ 30          Lee testified C.S. had been in a foster home with her sister and her great aunt and uncle, Ray and Angie D., since coming into care. Ray and Angie were interested in adopting C.S. and were properly providing for her needs. Ray and Angie had C.S. involved in extracurricular activities, such as swimming lessons. Ray and Angie were open to maintaining C.S.'s relationship with her parents "as long as everything is controlled and safe." Lee observed C.S. cuddling on the couch with Ray and Angie after coming home from school and being "very comfortable" with them. C.S. was well-integrated in her foster family and their extended family. Lee stated C.S. "wants to stay with Ray and Angie," explaining, "[I]t's been the only thing that she has known for the last couple of years and, specifically, wanting to stay with her sister as well."

¶ 31          On cross-examination, Lee stated C.S. "really enjoys getting to understand the paternal side of her family" since respondent began visiting. C.S. was calling respondent "dad." C.S. "loves the gifts that [respondent] brings" and "enjoys the time that she kind of now gets to spend with him even though she was a little bit hesitant at first." C.S. was "opening up about the idea of having [respondent] more consistently in her life." Lee believed respondent would be able to provide food, shelter, health care, and clothing for C.S. Lee believed respondent would be able to integrate C.S. into his family, community, and religious activities. Lee did a safety check on respondent's home and had no concerns. However, Lee felt it would be disruptive to C.S. if she was removed from Ray and Angie's home and separated from her sister.

¶ 32                              b. Respondent

¶ 33          Respondent testified he has had a total of seven visits with C.S. so far, either over Zoom or in person. He explained the visits have been going "[g]reat," and there was an "immediate" bond between them. Respondent was concerned about "red flags" he noticed in Angie's interactions with C.S. Respondent testified about C.S. telling him Angie does not allow her to tell anyone who he is. Respondent described a Zoom visit with C.S. in which he told her she was Mexican and Italian, to which Angie "in a joking manner" allegedly responded, "no, you're just a Mexican." Finally, respondent expressed concern over Angie not responding adequately when C.S. slipped during a visit at a bowling alley. According to respondent, Angie is "more concerned with what [C.S.] says than [with] what she does, and that's a red flag for [him] as a father." When asked what might correct these issues, respondent answered, "I believe [C.S.] needs to be reunited with me immediately." Respondent felt he was able to provide food, healthcare, and clothing to C.S. Respondent would provide for C.S.'s educational needs and would have her in extracurricular activities. Respondent was open to maintaining the relationship

between C.S. and her sister. Respondent felt C.S. would be integrated into his immediate and extended family.

¶ 34                           c. The Trial Court's Best-Interest Finding

¶ 35        The trial court found the State proved by a preponderance of the evidence terminating respondent's parental rights was in C.S.'s best interest. The court noted C.S. "has an interest in a loving, stable, and safe home environment *** and that's really what we're here for." The court expressed concern over the potentially disruptive effects of removing C.S. from her foster home. Respondent's involvement did not begin at the "11th hour," but at "pretty much 11:59 in terms of the court case." While the court appreciated respondent's efforts, it felt it was "really unfair to [C.S.] that we overlook the bond that she has with the people who have raised her for more than half of her life." The court emphasized Ray and Angie have provided C.S. stability and provide for her needs. Additionally, Ray and Angie have cared for C.S.'s sister, with whom C.S. "has spent her entire life." C.S.'s "entire sense of identity has been developed as part of [Ray and Angie's] household." Ultimately, "[a]ll of the factors say it's not fair to [C.S.] to not keep her where she is at."

¶ 36        This appeal followed.

¶ 37                           II. ANALYSIS

¶ 38        Respondent argues the trial court's unfitness and best-interest findings were against the manifest weight of the evidence.

¶ 39                           A. The Bifurcated Termination Standard

¶ 40        The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). Together, the statutes outline two necessary steps the

State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental rights serves the best interest of the child. *Id.* at 494-95.

¶ 41 "The State must prove parental unfitness by clear and convincing evidence." (Internal quotation marks omitted.) *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011). The Adoption Act provides several grounds on which a trial court may find a parent "unfit." 750 ILCS 50/1(D) (West 2022). Despite several potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [trial court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83.

¶ 42 This court affords great deference to a trial court's fitness finding "because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility." (Internal quotation marks omitted.) *A.L.*, 409 Ill. App. 3d at 500. We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *Id.*

¶ 43 Subsection (b) of the Adoption Act provides that a trial court may find a parent unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. 750 ILCS 50/1(D)(b) (West 2022). When examining allegations under subsection (b), a trial court must focus on the parent's reasonable efforts and consider any circumstances that may have made it difficult for the parent to visit, communicate with, or otherwise show interest in the child. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). However, a parent must show a reasonable amount of interest, concern, or responsibility—a demonstration of "some interest or affection" toward the child is not enough. *Id.*

¶ 44 Respondent and Samantha coparented C.S. from her birth in October 2017 until some point in 2020. From that point until their first visit in 2024, three years into the pendency of this case, respondent did not participate in the case or have any contact with C.S. Respondent testified he had no knowledge of the case or of C.S. being in foster care until early 2024. However, the trial court noted the 2024 document from which respondent purportedly learned C.S. was in foster care reflects she was there at least a year earlier. By that point, it had already been approximately three years with no contact between respondent and C.S. The first time respondent saw C.S. since losing contact in 2020 was the day before the fitness hearing, in March 2024. While respondent claimed Samantha would not allow him to see C.S., "[e]ven extreme circumstances that impede the parent's ability to develop a relationship with the child do not excuse a *complete lack of communication* or interest in the child." (Emphasis added.) *In re A.S.B.*, 293 Ill. App. 3d 836, 843-44 (1997). Respondent first explained he did not contact a local attorney for assistance with establishing visitation because he needed help from someone in Samantha's community who "knew what [he] was dealing with" in terms of their dysfunctional relationship. But respondent later explained he did not do so to avoid making C.S.'s life "messy or hard" by having a "custody battle" with Samantha. Until his first contact with Lee, respondent did not contact any state agencies for assistance with seeing C.S. Moreover, respondent testified he "didn't have much to offer" C.S. or Samantha and felt C.S. was better off with Samantha (despite believing her to be "evil" and "an animal").

¶ 45 Respondent at most demonstrated *some* interest or affection toward C.S. through his purported communications with Samantha in an attempt to establish visitation. But this is simply not enough. See *Jaron Z.*, 348 Ill. App. 3d at 259. Based on the evidence presented at the fitness hearing, the trial court's finding respondent failed to maintain a *reasonable* degree of

interest, concern, or responsibility regarding C.S.'s welfare was well-supported by the record. As such, we cannot say the opposite conclusion was clearly evident. Thus, we conclude the court's finding respondent was unfit was not against the manifest weight of the evidence. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 46                     B. The Trial Court's Best-Interest Finding

¶ 47          After a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352, (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. In making the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the [trial] court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 48        C.S. had been living with her sister, Ray, and Angie since coming into care in 2021. Ray and Angie had been providing for C.S.'s needs the entire time and were interested in adopting her. Lee observed C.S. being "very comfortable" with Ray and Angie and testified C.S. was well-integrated into their family. Both Lee and respondent testified respondent would be able to provide for C.S.'s needs and integrate her into his family. Respondent testified about "red flags" he observed in Angie's interactions with C.S. However, C.S. wanted to stay with Ray and Angie, as theirs was the only home she had known since coming into care and she lived with her sister there.

¶ 49        Both Lee and respondent testified about the bond which developed between respondent and C.S. once respondent reentered her life after several years. Indeed, C.S. had been "opening up about the idea of having [respondent] more consistently in her life." However, while a genuine bond of love between C.S. and respondent may have existed, "[f]ollowing a finding of unfitness *** the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be

terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. The existence of a parent-child bond "does not automatically insure that *** the child's best interests will be served by that parent." *In re J.B.*, 198 Ill. App. 3d 495, 499 (1990).

¶ 50        The trial court stressed the need to maintain the stability and permanence of C.S.'s life in the foster home where she had been with her sister since coming into care and which had been providing for her needs the entire time. The court also emphasized the potentially disruptive effects of removing C.S. from this home. The court's finding termination of respondent's parental rights was in C.S.'s best interest was well-supported by the record. As such, we cannot say the opposite conclusion to was clearly evident. Thus, we conclude the court's finding termination of respondent's parental rights was in C.S.'s best interest was not against the manifest weight of the evidence.

¶ 51                                III. CONCLUSION

¶ 52        For the reasons stated, we affirm the trial court's judgment.

¶ 53        Affirmed.